Raymond P. HUTCHINSON

v.

AMERICAN OIL COMPANY.

Civ. A. No. 33949.

United States District Court
E. D. Pennsylvania.

Aug. 14, 1963.

William L. Matz, Philadelphia, Pa., David M. Blum and Robert G. Levy, Baltimore, Md., and Arnold Fleischmann, Towson, Md., for plaintiff.

Henry A. Frye and John J. Runzer, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This suit arises from the contention of plaintiff that defendant has conspired, in violation of the antitrust laws, to enter into certain LC and COSS contracts, which are alleged to be, *per se,* violations of those laws, and, as part of that conspiracy, has terminated certain contracts between the parties to this suit as described below.

On or before May 31, 1963, defendant notified plaintiff that it was terminating these contracts as of July 31, 1963 (P–6). By letter of July 13, 1963, plaintiff's attorneys notified defendant that "We firmly believe that * * * Mr. Hutchinson would be entitled to an immediate injunction restraining the company from terminating his bulk plant contractor agreements pending the disposition of Mr. Hutchinson's claims under the antitrust laws" (P–29). Late on the afternoon of July 31, plaintiff notified defendant that he was instituting a suit requesting such an injunction (P–28) and on the afternoon of August 2 this suit and Motion were filed. Testimony was taken on August 7, 8, 9 and 12. No requests for findings of fact or conclusions of law have been filed.

*Bulk Plant Contract*

Pursuant to a contract dated June 1, 1959, plaintiff became a Bulk Plant Contractor of defendant at Allentown, Pa., with provision that he should receive a commission per gallon of liquid petroleum product delivered to defendant's customers in the Allentown area (see P–4). At the same time, the parties executed a contract under which defendant agreed to pay plaintiff $150. per month for "transporting, installing, relocating, removing, repairing, and maintaining equipment and facilities loaned by American to its dealers and customers" in the Allentown area. These contracts were terminable by either party on ten days' notice (see paragraphs 9 & 11 to the contracts marked P–4). Supplements to these contracts have been marked as P–4A to P–4H and P–16.

When plaintiff entered into this Bulk Plant Contract, thereby undertaking to service certain retail gasoline service stations of defendant in the Allentown area, 15 such dealer stations already selling gasoline and related products for defendant were assigned to him (see testimony of Mr. Hoffman). On July 1, 1963, he was still servicing 15 retail stations of defendant, 5 of his own dealer stations,[1] and 6 stations operated by defendant (N.T. 13–14).

He also serviced commercial accounts from the Allentown Bulk Plant, but many of such accounts had been turned over to him by defendant on June 1, 1959, and he has failed to sustain his burden of showing which, if any, of such accounts he secured since that date. It is also noted that plaintiff has not shown that he made prompt efforts after June 1, 1963, to secure a position as a distributor of the petroleum products of the other oil companies operating in this area.

Since plaintiff conceded that he had suppliers of fuel oil and kerosene at the time of the hearings on this Motion, there is no need to discuss any irreparable harm to him through loss of defend-

[1] See dealer contracts marked P–5 covering 1834 Hanover Avenue in Allentown, Ridge Road & Bethlehem Pike in Sellersville, 7th and Broadway in Wind Gap, and 9th and Main Streets in Pennsburg. He also operated a station at Union Boulevard and Quebec Street in Allentown through a lessee. See P–28. Defendant has agreed to continue supplying these five stations with petroleum products until final determination of this case, so that no irreparable damage is involved in the plaintiff's operations at these stations.

ant as one of his suppliers of fuel oil. There has been no showing that plaintiff cannot secure the fair value of such of his trucks and equipment as may not be needed for his fuel oil and kerosene business. See P–24 and depreciation schedule attached to P–14. Defendant has agreed to pay plaintiff for all petroleum products on hand at the Bulk Plant as of 7/31/63.

Furthermore, the evidence discloses that defendant terminated this contract because the operation of its Allentown Bulk Plant by its own employee, as opposed to the operation by an independent contractor such as plaintiff under this contract, would save defendant approximately $30,000. per year (testimony of Aschemeyer, e. g. N.T. 329).[2]

### TBA Contract

On February 28, 1961, plaintiff entered into a TBA Jobber Contract (P–3) providing for defendant's selling "Tires, Tubes, Batteries, and Automobile Accessories" to plaintiff, which he resold to defendant's operators of service stations. This replaced a similar TBA Jobber Contract under which sales had been made of a much more limited line of accessories prior to 1961.

Plaintiff has failed to sustain his burden of showing any immediate and irreparable harm to him as the result of the cancellation of this contract. Defendant will pay to plaintiff the cost of all inventory on hand under this contract as of 7/31/63 (approximately $15,000.). Plaintiff has failed to show that his efforts have resulted in any increased TBA business in the Allentown area. The year before plaintiff secured his first TBA contract with defendant, the gross amount of defendant's sales in this area was $28,990. (P–23). All defendant's customers were turned over to plaintiff. Plaintiff's gross purchases from defendant in this business were as follows (P–23):

| 1960 | About $23,327.00 |
| 1961 | About $26,948.00 |

There was a large increase in these sales in 1962 (P–23), but plaintiff concedes that this increase was primarily due to defendant's making available to him the enlarged Atlas line of over 200 items, whereas prior to the last part of 1961 only about 14 such items were available for sale. Defendant has salesmen making sales of these items which are channeled to plaintiff and at least 50% of such sales in this area were produced by the efforts of defendant's employees (N.T. 425).[3]

The greatest weakness of the plaintiff's proofs is the failure to prove any causal connection between defendant's use of LC contracts and the termination of plaintiff's Bulk Plant and TBA contracts, even assuming that such LC contracts are, per se, violations of the antitrust laws.[4] The uncontradicted testimony discloses that Bulk Plant Distribu-

---

2. Defendant's memoranda concerning the termination of plaintiff as a Bulk Plant contractor are P–17 to P–19. LC designates Lease-Consignment and COSS designates Commission Operated Service Station.

3. Also, defendant's employees performed other services for plaintiff under these contracts, including collection of numerous delinquent accounts for plaintiff.

4. Although the opinion of the Federal Trade Commission in In the Matter of Atlantic Refining Company (Docket No. 7471 dated 5/16/63) gives some support to plaintiff's contention, it is noted that the Commission felt it necessary to distinguish United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), on grounds such as the following, which find no support in this record:

(a) General Electric's arrangement was permanent, while Atlantic's plan was only a tactical move in a price war.

(b) General Electric's arrangement was universally applied, while Atlantic used its consignment device only where it was threatened with unstable prices.

(c) General Electric's "agency" was a matter of "substance" and Atlantic's change was only in "form."

(d) Atlantic's consignees commingled gas receipts with income from other products, while General Electric's licensees

tors service LC and COSS stations for defendant just as much and just as effectively as "B" Station Agencies (the operation of bulk plants by employees of the company, which is the method of operation followed by defendant at the Allentown Bulk Plant since July 31, 1963). See N.T. 367–369 and 330–331. Plaintiff has failed to establish the following part of the conspiracy, as alleged in paragraph 17(a)–3 of its Complaint:

"American then will induce or require independent retail gasoline service station operators to enter into so-called 'lessee-consignee' agreements, *which agreements were not possible while independent middlemen, such as plaintiff, supplied refined petroleum and related products to retail outlets;"* (Emphasis supplied.)

This same allegation is repeated as follows on page 2 of plaintiff's Memorandum in Support of MOTION FOR PRELIMINARY INJUNCTION:

"In furtherance of this conspiracy defendant American has terminated and refused to deal with independent contractors and distributors of refined petroleum and related products, including plaintiff, in an effort to obtain control of the distribution of these products to retail outlets. *Having once secured control of wholesale distribution,* defendant is then able to enter into 'lessee-consignee' agreements with retail gasoline service station operators." (Emphasis supplied.)

However, the record shows that the LC contracts can be entered into between defendant and its service station operators, whether or not the independent contractor-Bulk Plant distributors are the means of getting the petroleum products to the service station. The defendant has separate contracts with its service station operators and neither a Bulk

Plant distributor nor a "B" Station Agent has any control whatever over the price of gasoline charged to, or by, the service station operators.

As pointed out above, the elimination of plaintiff as a Bulk Plant distributor is for economic reasons (see, also, N.T. 369 ff.). Also, it is noted that there were only two of the 26 service stations serviced by plaintiff on July 1 that were under LC, as opposed to independent dealer operation, and one of these was re-opened under such a contract after it had been closed for several months due to the inability to get anyone who could finance its operation as an independent dealer station (N.T. 423–425 and 25). The other LC station was converted from a dealer station in order to enable the operator to finance an increased inventory of gasoline resulting from a rebuilding of the station (N.T. 340).

■ Plaintiff is not entitled to a preliminary injunction under 15 U.S.C.A. §§ 15 and 26 unless he is injured "by reason of anything forbidden in the antitrust laws." See 15 U.S.C.A. § 15. As stated by this court in Gomberg v. Midvale Company, 157 F.Supp. 132, 141 (E. D.Pa.1955):

"Private antitrust actions are not founded upon the mere circumstances of a conspiracy in restraint of trade, but upon injuries that would directly or proximately result from the commission of the act in violation of the antitrust laws."

See, also, Fiumara v. Texaco, Inc., 204 F.Supp. 544, 547 (E.D.Pa.1962). This situation is similar to that before the court in Turner Glass Corporation v. Hartford-Empire Co., 173 F.2d 49, 52– 53 (7th Cir., 1949), where the court said:

" 'The contract in suit is complete in itself, involves the doing of nothing illegal, and is enforceable without reference to any other agree-

were apparently more strictly held to account.
Furthermore, the record shows an economic need for use of the LC contract in

the case of a service station operator with limited credit and the use of this LC device by defendant at a very small number of its service stations (N.T. 365–6).

ment. I fail to see how there can be any illegality "inherent" in one contract when it is necessary to go wholly outside of it and into another contract to find illegality.' "

Similarly, the Supreme Court of the United States said in Bruce's Juices v. American Can Co., 330 U.S. 743, 755, 67 S.Ct. 1015, 1020–1021, 91 L.Ed. 1219 (1930):

"But, when the contract sued upon is not intrinsically illegal, the Court has refused to allow property to be obtained under a contract of sale without enforcing the duty to pay for it because of violations of the Sherman Act not inhering in the particular contract in suit * *."

██ In this case, defendant had a right under the terms of these two contracts (P–3 and P–5) to terminate them and plaintiff has not shown that the exercise of such right had any causal connection whatever with its use of LC contracts with two out of 26 gas station operators serviced from the Allentown Bulk Plant. It has been consistently held by the Federal Courts that a private antitrust plaintiff seeking an injunction must show actual damage or injury to his business or property from the antitrust violation and that it is not enough to show damage or injury suffered by the public at large. See Louisiana Petroleum Retail Dealers v. Texas Company, 148 F.Supp. 334 (W.D.La.1956); Peller v. International Boxing Club, 135 F. Supp. 942 (N.D.Ill.1955), aff'd. 227 F.2d 593 (7th Cir., 1955); Revere Camera Co. v. Eastman Kodak Co., 81 F.Supp. 325 (N.D.Ill.1948). Cf. Gomberg v. Midvale Company, 157 F.Supp. 132 (E.D. Pa.1955).

The heavy burden resting upon a plaintiff in establishing the right to a preliminary injunction has been frequently emphasized by the United States Court of Appeals for the Third Circuit. See Madison Square Garden Corp. v. Braddock, 90 F.2d 924 (1937); Joseph Bancroft & Sons Co. v. Shelley Knitting Mills Co., 268 F.2d 569 (3rd Cir., 1959).

In the Madison Square Garden Corp., case, supra, the court said 90 F.2d at page 927:

"It has been well stated that upon an application for a preliminary injunction to doubt is to deny."

In view of the uncontradicted testimony that defendant has 700 LC service stations out of a total of 28,000 service stations (N.T. 365–366), that this number has not increased over the past six years, and the lack of evidence indicating any monopoly or purpose to create a monopoly, Bergen Drug Company v. Parke, Davis & Company, 307 F.2d 725 (3rd Cir., 1962), is quite distinguishable. In the Bergen case, the court said 307 F.2d at page 727, after pointing out that defendant had refused to deal with plaintiff after the antitrust suit had been instituted and because of that suit:

" * * * the Supreme Court qualified its statement concerning a seller's freedom to choose customers by indicating that the rule would not apply where there is a purpose to create or maintain a monopoly. The undisputed facts here are that the buyer-seller relationship was discontinued because of the filing of the main action. True enough, the defendant can choose customers, but it should not be permitted to do so in order to stifle the main action, especially where it is apparent that such conduct will further the monopoly which plaintiff alleges defendant is attempting to bring about and which, if proved, would entitle plaintiff to permanent relief."

In this case, the contracts were terminated before any suggestion of an antitrust suit was mentioned by plaintiff. Also, there is no showing on this record that plaintiff cannot get all his requirements from other suppliers. As far as plaintiff's testimony is concerned, he may have gone to the few oil companies he has solicited as late as within two weeks of the institution of this suit. The testimony of Mr. Doty (N.T. 451) shows that plaintiff has no difficulty in getting

witnesses on his behalf and opposed to defendant.[5]

### ORDER

And now, August 14, 1963, plaintiff's motion for a preliminary injunction (Document No. 2) is denied.

5.   P-2 has been received in evidence.