**McKESSON AND ROBBINS, INC.**

v.

**CHARLES PFIZER & CO. Inc.**

and

**American Cyanamid Co.**

**Civ. A. No. 36342.**

United States District Court
E. D. Pennsylvania.

Nov. 4, 1964.

Order Nov. 5, 1964.

Fox, Rothschild, O'Brien & Frankel, Nochem S. Winnet, Philadelphia, Pa., Arnold, Fortas & Porter, Paul A. Porter, William L. McGovern, Abe Krash, Robert E. Herzstein, John D. Hawke, Jr., Daniel A. Rezneck, Washington, D. C., Morgan, Finnegan, Durham & Pine, George B. Finnegan, Jr., Jerome G. Lee, David H. Pfeffer, New York City, Laurence C. Ehrhardt, New York City, of counsel, for plaintiff, McKesson & Robbins, Inc.

Drinker, Biddle & Reath, Philadelphia, Pa., Donovan, Leisure, Newton & Irvine, New York City (Lewis H. Van Dusen, Jr., Philadelphia, Pa., Walter R. Mansfield, Richard Y. Holcomb, New York City, Patrick T. Ryan, Philadelphia, Pa., of counsel), for defendant American Cyanamid Co.

DAVIS, District Judge.

This action was instituted on August 11, 1964 by the filing of a complaint for declaratory judgment by McKesson and Robbins, Inc. (McKesson) against Charles Pfizer & Co., Inc. (Pfizer) to have Pfizer's tetracycline patent declared invalid. On August 14, 1964 McKesson

amended its complaint to allege a cause of action against Pfizer and American Cyanamid Co. (Cyanamid) for treble damages and injunctive relief under the authority of Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) as a result of violations by the defendants of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). At the time McKesson filed its amended complaint, it moved for a temporary restraining order against Cyanamid only, which was denied by this Court, after argument, on August 17, 1964. A hearing was set on McKesson's motion for a preliminary injunction against Cyanamid which was held on August 26, 27, 28 and 31, 1964. Thereafter, briefs were submitted on McKesson's motion which is before this Court for disposition.

## STATEMENT OF FACTS

McKesson is "full-line, full-service"[1] wholesaler in pharmaceutical products with locations throughout the United States. For more than thirty (30) years McKesson has been distributing the Cyanamid pharmaceutical products manufactured by Cyanamid's Lederle Laboratories Division (Lederle) pursuant to a "Wholesale Distributor Agreement."

Lederle manufactures approximately 400 different drugs and sells these directly to retail druggists, to wholesalers for resale to druggists and hospitals, and to hospitals directly. Lederle's sales in 1963 totaled some $112 million, of which only 15% or $16.8 million, were to wholesalers. Lederle sales to McKesson in 1963 totaled $2.78 million of which approximately 50%, or $1.4 million, were for the sale of broad spectrum antibiotics.

McKesson buys from some 6,000 suppliers and sells to approximately 38,000 retail pharmacists and more than 85% of all the hospitals in the country. Ranked by dollar sales, Lederle was the twenty first largest supplier for McKesson.

At the core of the instant action is Lederle's broad spectrum antibiotic drug known generically as tetracycline but which is normally sold by its brand name, Achromycin.[2] This drug is colloquially known to the layman as a "wonder drug". It is one of the major broad spectrum antibiotics available to the medical profession today for the treatment of various infectious diseases. This drug, Achromycin, has been marketed by Cyanamid through its Lederle division since 1953 and accounted for approximately 40% of the 1963 sales of tetracycline in this country.

The patent for the production of tetracycline is held by Pfizer who has licensed Cyanamid to make and sell tetracycline.[3] Cyanamid has licensed Pfizer to use Aureomycin[4] in the production of tetracycline. A license from the other is necessary for both Pfizer and Cyanamid to produce tetracycline. These licensing agreements are non-exclusive, but since 1956 neither defendant has issued a license[5] for the manufacture or sale of tetracycline.

Tetracycline is sold on a physician's prescription only, and in approximately 80% of the sales, the physician prescribes the drug by a brand name. The remaining 20% of the sales by druggists is on a generic prescription. By law in some jurisdictions, and by custom in all areas, a pharmacist may not substitute one brand of tetracycline for the one called for by the physician's prescription. Where the drug is prescribed generically,

1. This descriptive phrase means that the wholesaler handles every significant line of all the major manufacturers in pharmaceuticals, toiletries, sundries, etc., that a retail druggist requires.

2. Pfizer's tetracycline product is sold under the brand name Tetracyn.

3. In 1956, Pfizer also licensed Bristol to make and sell tetracycline, and Squibb and Upjohn to sell tetracycline.

4. This drug is known generically as chlortetracycline and Cyanamid received a patent on this drug in September 1949. It is used to produce tetracycline by Pfizer's process known as "deschlorination".

5. See footnote 3, supra.

the pharmacist may use any brand to fill that particular prescription.

In June, 1964, Cyanamid learned that McKesson intended to market its own brand of tetracycline by purchasing bulk tetracycline from Rachel Laboratories, Inc. of California (Rachel).[6] On July 31, 1964, McKesson publicly announced that it was commencing the marketing of tetracycline under its own brand name, "McKesson Tetracycline". The following Monday, August 3, 1964, Cyanamid, through Lederle, cancelled the Wholesaler Agreements with McKesson effective immediately.[7] This cancellation terminated the sale of all the products in the Lederle line and was not confined to the antibiotic field.[8]

McKesson now requests this Court to grant an injunction pendente lite requiring Lederle to continue to sell to McKesson under the same terms and conditions as existed prior to the cut-off of the Lederle line.

## DISCUSSION

■■ Preliminarily, the request for a preliminary injunction, at the very outset of the litigation, is addressed to the sound discretion of the Court. Joseph Bancroft and Sons Co. v. Shelley Knitting Mills, Inc., 268 F.2d 569 (3rd Cir. 1959). The plaintiff must show: (1) that the conduct to be enjoined is in furtherance of the alleged violations of the Sherman Act; (2) that there is a substantial likelihood the allegations of the complaint will be sustained at the trial of the cause; (3) that irreparable harm to the plaintiff will result if the injunction pendente lite is denied; (4) and that there is no conduct by McKesson which would bar the granting of equitable relief.[9]

■ Cyanamid urges that the cut-off by Lederle was a unilateral action on its part and the decision was reached without consultation with anyone outside of the defendant company. Thus, Cyanamid would try to come within the rule laid down in United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), and the cases following this decision. However, this Court feels that Colgate and its holdings are not applicable to the instant case. Colgate dealt with a refusal to deal by a supplier in order to enforce its resale price policy.[10] In the present case there is no claim of price-cutting by McKesson of Cyanamid's product nor that the cut-off was merely the result of the enforcement of Cyanamid's resale price policy.[11]

Since McKesson has entered the tetracycline market, the granting of an injunction will force Cyanamid to act as a supplier to a wholesaler which has become a competitor in the same field. Relying on Deltown Foods, Inc. v. Tropicana Products Inc., 219 F.Supp. 887 (S.D.N.Y.1963), Cyanamid argues that a supplier is not required to deal under such circumstances. We agree with the holding of Deltown but find the facts of this case compel a contrary result. We are here concerned with an important pharmaceutical product which may be purchased only when prescribed by a physician and such prescriptions are written by brand name 80% of the time. As a result, in the vast majority of sales of tetracycline, there is no independent choice of brand by either the seller (pharmacist) or the buyer (patient). In Deltown, the Court recognized the defendants' position that the refusal to deal "* * * was justified because of the

6. Rachel is and has been a supplier of tetracycline for the United States Government.

7. The Agreement provided for its cancellation by either party upon written notice to the other.

8. Cyanamid has not cancelled its sales to McKesson through other divisions not involved in the pharmaceutical industry.

9. This fourth criterion is present in the instant action since Cyanamid has raised the equitable defense of unclean hands.

10. See Klein v. American Luggage Works, Inc., 323 F.2d 787 (3rd Cir. 1963).

11. Cf. John J. & Warren H. Graham v. Triangle Publications, Inc., 233 F.Supp. 825, opinion by Higginbotham, J., E.D. of Pa., filed August 21, 1964.

damage plaintiffs could do to defendants' product by treating it as second best * * *." 219 F.Supp. at 890. In this case, McKesson is not in a position to represent their brand of tetracycline as superior to Cyanamid's where a pharmacist is compelled to furnish his customers with the specific brand of tetracycline prescribed by the physician.

This court also rejects Cyanamid's claim that the cut-off was the result of a business policy, inaugurated four years ago, to reduce the number of wholesalers handling the Lederle line.[12] During this period, only four wholesalers were terminated and each for sound business reasons.[13] On the other hand, Cyanamid indicated [14] that the entrance of McKesson into the tetracycline market was the reason for the termination of McKesson's Wholesaler Agreements.

A more perplexing problem is whether McKesson has shown a probability that it can prevail on the merits. That the plaintiff show to a certainty that it will prevail after the trial, is not necessary. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (1953). In Railroad Yardmasters of America v. Pennsylvania Railroad Co., 224 F.2d 226 (3rd Cir. 1955), the Court of Appeals for this Circuit, in reviewing the propriety of the granting of an injunction pendente lite, was concerned whether or not the plaintiff in that case had "' * * * raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation'", citing Hamilton Watch Co. v. Benrus Watch Co., supra.

That the plaintiff will not ultimately prevail in its quest for permanent relief is always a possibility, but this does not preclude this Court from granting temporary relief pending a final adjudication. Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725 (3rd Cir. 1962).

The amended complaint charges Cyanamid and Pfizer with a conspiracy to fix prices and to monopolize the manufacture and sale of tetracycline. McKesson need not prove these allegations at this stage of the proceedings, but, paraphrasing the above quotation from Hamilton, McKesson must raise questions going to the merits of these allegations which are substantial and serious.

The Federal Trade Commission instituted proceedings against Cyanamid, Pfizer and three other pharmaceutical firms charging them with the violation of Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(a)). The essence of the charge was that these firms had engaged in unfair competition with respect to tetracycline in its manufacture and sale. After extensive hearings, the Commission found that Cyanamid, Pfizer and the other respondents were engaged in a conspiracy to fix, maintain and stabilize the price of tetracycline. In the Matter of American Cyanamid et al., F. T.C. Docket No. 7211, August 8, 1963. In finding such a conspiracy, the Commission partially overruled its hearing examiner who found that the evidence did not sustain the charge.[15] The Commission subsequently entered an order requiring Cyanamid and Pfizer to license certain patents to any applicant [16] on a specified royalty basis.

There is no need for the citation of authority for the proposition that this Court may take Judicial notice of the Commission's proceeding, decision or or-

12. Lederle sold its pharmaceutical products to approximately 430 wholesalers, including 92 of McKesson's 103 drug divisions or branches.

13. Three of the terminations were the result of a wholesaler refusing to accept unrequested automatic shipments. See plaintiffs' exhibits 24, 25 and 27. The fourth wholesaler was terminated since he was no longer a drug wholesaler. See plaintiff's exhibit 26.

14. See defendant's exhibit 15 and notes of testimony at the preliminary injunction hearing pp. 553–560. See also, plaintiff's exhibit 23.

15. The final decision of the Commission has been appealed to the U. S. Court of Appeals for the Sixth Circuit American Cyanamid Co. et al. v. F. T. C., No. 15805.

16. McKesson has applied for a license from Pfizer which has been refused.

der. Cyanamid urges, however, that no weight should be given to those findings because the decision is not final as required by Section 5 of the Clayton Act (15 U.S.C. § 16(a)), and also because the proceeding and decision were under the Federal Trade Commission Act and not under the Clayton Act. Cyanamid argues, and McKesson admits, that the decision of the Commission is not admissible as prima facie evidence of a violation of the antitrust laws in a civil action by the Government or a private party. This Court agrees that the decision would not be admissible at the present time in a trial on the merits due to its lack of finality. Thierfeld v. Postman's Fifth Avenue Corp., 37 F.Supp. 958 (S.D.N.Y. 1941). But its admissibility as prima facie evidence would be for the purpose of proving the allegations of the amended complaint and this the plaintiff, on a motion for a preliminary injunction, need not do. Bergen Drug Co. v. Parke, Davis & Co., supra; Hamilton Watch Co. v. Benrus Watch Co., supra.

Cyanamid cites in its brief United States v. Chas. Pfizer & Co., Inc. et al., 205 F.Supp. 94 (S.D.N.Y.1962) [17] where the Court held that the administrative findings of the Federal Trade Commission were not binding on the Government in that criminal proceeding nor would they be admissible on the trial of the cause. We agree. United States v. Radio Corp. of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). But the Court was there dealing with the hearing examiner's findings and decision exonerating the respondents and the full Commission had not yet rendered its decision. Also, the Federal Trade Commission Act specifically provides in Sections 5(e) and 11 that no Federal Trade Commission order shall relieve any person from liability under the antitrust laws. (15 U.S.C. §§ 45(e), 51).

■■■ We turn now to the cross-licensing agreements between Cyanamid

and Pfizer. Cyanamid points out that a patent is a legal monopoly and the patent holder has the statutory right to exclude others from making, using or selling the patented product. (35 U.S.C. § 154). In an exhaustive opinion, which is cited by Cyanamid to support this position, Chief Judge Leahy held that the exercise of the rights granted the holder of a valid patent, including a refusal to license others, was not a violation of the Sherman Act per se. United States v. E. I. Du Pont De Nemours & Co., 118 F.Supp. 41 (D.Del 1953), aff'd 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. That holding was after a full hearing in the light of all the evidence with extensive findings of fact which showed rapidly declining prices, expanding production and intense competition. In the instant case, the price of tetracycline remained the same for both Pfizer's Tetracyn and Cyanamid's Achromycin from 1955 to 1960; between 1960 and 1964 there were three price reductions but, except for a short period of time in which there was a disparity in price, the prices were identical thereafter; with the exception of the license to Bristol in 1956, no other company has been licensed to manufacture tetracycline; since 1956, no other company has been granted a license to sell tetracycline though the cross-licensing agreements are non-exclusive; and there is evidence [18] tending to show that the defendants, Pfizer and Cyanamid, have exchanged pricing information though at the same time were competitors. In view of all the foregoing, this Court feels that McKesson has raised questions going to the merits of the alleged conspiracy so substantial "as to make them a fair ground for litigation and thus for more deliberate investigation." Hamilton Watch Co. v. Benrus Watch Co., supra.

It is true, as the defendant states, that in order for the cut off by Lederle to be unlawful there must be some connection between the alleged conspiracy

17. An indictment was filed on August 17, 1961 charging Cyanamid, Pfizer, Bristol and their chief executives with antitrust violations. The case is presently awaiting trial.

18. See plaintiff's exhibit 18.

749

and the refusal to deal. See Hutchinson v. American Oil Company, 221 F.Supp. 728 (E.D.Pa.1963); Deltown Foods, Inc. v. Tropicana Products, Inc., supra. As noted earlier in this opinion, Lederle's cancellation of the McKesson Wholesaler Agreements is claimed to be nothing more than a unilateral refusal to deal and evidence [19] to support this contention was introduced at the hearing. For purposes of this motion for a preliminary injunction, we find that Cyanamid did not contact anyone with respect to the proposed cut-off. But unilateral action, which in the absence of the alleged conspiracy would be lawful, is nonetheless regarded as transgressing the antitrust laws where it is the result of a conspiracy in restraint of trade and undertaken pursuant to conspiratorial aims. Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); Hub Auto Supply, Inc. v. Automatic Radio Mfg. Co., 173 F.Supp. 396 (D.Mass. 1959). Under the circumstances of this case, the refusal to deal does further the alleged conspiracy to fix and maintain the price of tetracycline and it is inconceivable that Cyanamid was unaware of this effect at the time of the cancellation of the Wholesaler Agreements. A party is held to have intended a natural consequence of its actions.

As stated earlier, the plaintiff must show that irreparable injury will result if the injunction pendente lite is not granted. Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, supra.[20] The Court of Appeals for this Circuit in a recent case concerning a refusal to deal by a drug manufacturer with a "full line, full service wholesaler", held that such a refusal would result in irreparable harm. Bergen Drug Company v. Parke, Davis & Company, supra. Though the issue of irreparable harm in Bergen was submitted to the Court on conclusory affidavits the evidence produced in this case compels us towards the same finding.

A retail pharmacist is in a highly competitive market with service his most endearing attribute and overhead his most potent enemy. It follows, therefore, that the pharmacist requires service from his supplier, the wholesaler, and he continually strives to limit his expenses. Where a minimum volume requirement exists, the druggist will give sufficient business to that wholesaler so as not to be penalized. If McKesson cannot supply the Lederle line, a pharmacist will give other items to the wholesaler who will supply the Lederle products he requires. Therefore McKesson will lose business far beyond those Lederle items it cannot supply. But in any event, McKesson will permanently lose the business of those druggists who do prefer to deal with only one wholesaler. If McKesson cannot provide all their needs, the economy minded druggists will deal with another wholesaler who can.

In the hospital and governmental institution area, a wholesaler who cannot provide all of the items called for in a contract to be let on bids is foreclosed from competition in this market. This would [21] result in a substantial loss of business which would be difficult, at best, to recover.

There is even a more serious loss which will be visited upon the plaintiff if it is denied relief. As stated by the Court of Appeals in Bergen, supra;

"It would be impossible to estimate or compute plaintiff's damages for the loss of good will which it will suffer as a result of being unable to provide its retail customers with service at least equally as good as that furnished by other wholesalers who have a continuing access to de-

20. See also: Sims v. Greene, 161 F.2d 87 (3rd Cir. 1947); John J. & Warren H. Graham v. Triangle Publications, Inc., supra, footnote 11.

21. It should be pointed out that evidence was produced at the hearing that McKesson was already running out of its inventory and that it defaulted on one contract already because of the cut-off. Notes of Testimony, pages 96, 253, 254.

fendant's products. Goods supplied to it by defendant are not otherwise available. * * *" (307 F.2d p. 728).

The loss of a major line of pharmaceuticals, including one of the most important drugs on the market today, cannot but diminish the plaintiff's prestige and good will as a full line, full service wholesaler.

As pointed out earlier in this opinion, this Court does not feel that McKesson may "push" its tetracycline brand to the detriment of the Lederle brand being supplied by Cyanamid. The prescription drug market is primarily controlled by the doctor and it is his decision on the brand to be supplied to the patient that results in the requirements of the druggist.

As to the remaining 20% of the tetracycline market, Lederle's chief executive officer indicates that Lederle's loss, if all of the generic sales of tetracycline through McKesson were diverted to McKesson's brand, would amount to only $50,000.[22] Where a dollar value can be placed on a possible injury, it cannot be said to be irreparable.[23]

█ Turning finally to the defense raised by Cyanamid that McKesson is guilty of unclean hands. Cyanamid asserts that Rachel is infringing its valid patent[24] for the fermentation of tetracycline and that McKesson, by buying bulk tetracycline produced by Rachel, has precluded itself from obtaining the equitable relief here requested. Before reaching the conclusion urged by Cyanamid, this Court would want to be convinced of the validity of the premise which, at this time, we are not.

To accept this premise on the basis of the evidence presented at the hearing would be pure speculation. Cyanamid has shown only that it holds a process patent for the production of tetracycline from strains of Streptomyces aureofaciens, a species[25] of microorganisms; that the patent covers strains of aureofaciens that produce tetracycline exclusively; that Rachel obtained its cultures from a Dr. Villax; that Dr. Villax sent a strain he called lusitanus to Dr. Woodruff who determined it to be a strain of the aureofaciens species; and that Dr. Growich knows of no strains of the aureofaciens species that produces tetracycline exclusively that are not covered by his patent. Cyanamid would have this Court conclude, therefore, that the strain used by Rachel is covered by the Growich patent. This we are unable to do.

McKesson asserts another ground for denying the application of the defense of unclean hands in this antitrust suit. Relying on Trebuhs Realty Co. v. News Syndicate Co., 107 F.Supp. 595 (S.D.N.Y. 1952),[26] McKesson urges that the defense of unclean hands is no longer available in a private antitrust action because of the overriding public interest involved in the enforcement of the antitrust laws. If the fact of infringement had been shown and that McKesson was somehow in pari delicto with Rachel, I would still be inclined to issue the relief requested.[27] Though it is still an open question whether the unclean hands defense has been completely abolished in antitrust actions, the authorities cited show a rather clear trend in that direction. In any event, the circumstances of this case dictate a finding that McKesson has acted in good faith

22. See Notes of Testimony, pages 572–579.

23. See Railroad Yardmasters of America v. Pennsylvania Railroad Co., 224 F.2d 226 (3rd Cir. 1955).

24. Growich Patent No. 3,092,556, defendant's exhibit 6.

25. A species of microorganism may contain millions of strains. See Notes of Testimony, pages 409–410.

26. See also: Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Moore v. Mead Service Co., 340 U.S. 944, 71 S.Ct. 528, 95 L.Ed. 681 (1951).

27. See John J. & Warren H. Graham v. Triangle Publications, Inc., supra footnote 11.

with respect to its entrance into the tetracycline market.

## CONCLUSIONS

The record before me indicates that the plaintiff has sustained its burden by showing that there exists serious and substantial questions as to merits of the allegations of the Amended Complaint involving the legality of Cyanamid's termination of the Wholesaler Agreements. These questions do make a fair ground for litigation with a reasonable likelihood that McKesson will prevail at the trial on the merits.

McKesson has also shown that it will suffer irreparable harm if an injunction pendente lite is not granted while the possible harm to Cyanamid is minimal. Finally, there is nothing on the record which precludes the granting of relief by way of the doctrine of unclean hands.

The foregoing Statement of Facts, Discussion and Conclusions shall constitute my Findings of Fact and Conclusions of Law. In addition, plaintiff's proposed Findings of Fact Nos. 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 16, 19, 20, 22, 24, 25, 26, 27, 29, 30, 32, 34, 36, 41, 48, 49, 50, 51, 52, 53, 55, 56, 57, 58, 61, 62, 63, 64, 65, 69, 70 and 71 are affirmed. Defendant's Proposed Findings of Fact Nos. 1(a)–(d), 2(a)–(c), 3(b)–(i), 4(a)–(f), 7(a)–(f), 10(a)–(b), 11(b)–(d), 13(b), 14(c), (e) and (f) are affirmed. All other Proposed Findings of Fact and Conclusions of Law inconsistent with this Opinion are severally denied.

## ORDER

And now, this 4th day of November, 1964, upon consideration of the record, the proposed findings of fact and conclusions of law and the briefs submitted on behalf of the parties, it is ordered that the defendant, American Cyanamid Company, is hereby enjoined from refusing to sell pharmaceutical and drug products to the plaintiff, McKesson and Robbins, Inc., pending final disposition of this litigation; the defendant is further ordered to resume selling its pharmaceutical and drug products manufactured by its Led-

erle Laboratories Division to the plaintiff on the same terms and conditions heretofore existing as provided in defendant's Wholesale Distributor Agreement; plaintiff shall file a bond in the amount of $50,000.00, upon which this Order shall become effective.

## ORDER

And now this 5th day of November, 1964, upon consideration of the Affidavit of Lyman C. Duncan, and the arguments of counsel, it is hereby ordered that the Motion to Stay this Court's Order, filed November 4, 1964 is hereby denied;

It is further ordered that this Court's Order, filed November 4, 1964, is hereby amended by adding:

"Plaintiff, McKesson & Robbins, Inc. shall not utilize its salesmen or employ other personnel in the detailing of physicians in their private practice for the promotion of McKesson brand tetracycline pending disposition of any appeal from this Order."