HADEN COMPANY, INC.

v.

JOHNS–MANVILLE SALES
CORPORATION.

No. CA 3–75–0255–C.

United States District Court,
N. D. Texas, Dallas Division.

Oct. 2, 1978.

James H. Baumgartner, Jr., Vial, Hamilton, Koch, Tubb, Knox & Stradley, Dallas, Tex., for plaintiff.

E. Russell Nunnally and Thomas W. Craddock, Coke & Coke, Dallas, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM M. TAYLOR, Jr., District Judge.

This Court makes the following findings of fact and conclusions of law with regard to this case:

### FINDINGS OF FACT

1. Haden Company, Inc. ("Haden") is a distributor for architectural products, building supplies and health equipment. Haden's trade area comprises the states of Texas, Oklahoma, Arkansas and Louisiana.

2. Johns-Manville is a manufacturer of building materials, one of which is wall panels which are used to construct the exterior wall or facia of a building. Johns-Manville manufactured two types of wall panels: one was an asbestos cement extruded ("ACE") panel; the other was an asbestos cement product which was not extruded.

3. ACE panels were marketed by Johns-Manville through authorized distributors pursuant to an ACE distributorship agreement. The other wall panels were marketed through authorized distributors pursuant to a master stocking distributor agreement.

4. Robert V. Lohse ("Lohse"), the product marketing manager for ACE products, visited Haden in early 1969 concerning the possibility of signing Haden as an ACE distributor. On December 10, 1969, Haden

entered into an ACE distributorship agreement and became an ACE distributor. Lohse signed Haden's distributorship agreement on behalf of Johns-Manville.

5. ACE distributors normally promoted and sold ACE products to general contractors. In the typical transaction, the ACE distributor contracted to sell the ACE panels to a general contractor, and, with contract in hand, purchased the panels from Johns-Manville at published prices. Each order was then specially manufactured by Johns-Manville.

6. Johns-Manville had an alternative method of sale available to all ACE distributors. At the distributor's option, Johns-Manville would sell the ACE panels to the ultimate user on a direct basis and pay the distributor his normal profit less five percent for carrying costs. The letter to all distributors setting out the alternative method of sale stated that prices and terms of payments would be negotiated by the distributor in accordance with the instructions of Johns-Manville. The instructions which Johns-Manville gave its distributors concerning the negotiation of prices and terms of payment were that the distributor could not sell at a price below Johns-Manville's cost and could not sell under unfavorable payment terms. Haden never utilized the alternative method of sale nor did he ever attempt to do so. Therefore, Haden's knowledge of how the alternate method of sale operated or what the instructions entailed was only speculative.

7. Haden became aware of the ACE product line through Ross Hull ("Hull"). At the time Hull apprised Haden of the ACE products, Hull was a salesman for a Johns-Manville distributor in New Jersey. Hull had formerly been employed by Johns-Manville in the division which manufactured and marketed ACE products. Hull eventually became an employee of Haden.

8. Numerous products serve the same purpose as ACE panels and are functionally interchangeable with ACE products. Haden is a distributor for some of these interchangeable products and at all times had sources other than Johns-Manville for products which were functionally interchangeable with the ACE products.

9. Prior to signing the ACE distributor agreement, and after hiring Hull, Haden began promoting ACE panels in its normal trade area. Shortly after Haden officially became an ACE distributor it contracted to sell ACE products for two large projects, the Twin Towers in Dallas, Texas, and the Shreveport Airport in Shreveport, Louisiana. Haden had begun promoting those projects near or about the time it became an ACE distributor. The total billings to Haden from Johns-Manville for the ACE panels for Twin Towers was $88,068.52. The total billings to Haden from Johns-Manville for the ACE panels for the Shreveport Airport was $95,730.03. Thus, the ACE materials purchased for these two early jobs totaled $183,798.55.

10. In the two years that it was an ACE distributor, Haden had only five other sales of ACE panels. On October 28, 1971, and October 29, 1971, Haden purchased $19,-452.40 of ACE panels from Johns-Manville for the Whitney Young project in Dallas, Texas. On August 13, 1971, Haden purchased $3,679.05 of ACE panels from Johns-Manville for Carnes Construction Company in Tulsa, Oklahoma. On October 18, 1971, Haden purchased $489.11 of ACE panels from Johns-Manville for Buttrum Construction Company in Ponca City, Oklahoma. The total purchases by Haden from Johns-Manville for the ACE products for these jobs was $23,620.56.

11. The ACE product line was new at the time Haden became a distributor and was in research and development. Consequently, one important factor in selling ACE products was promotion. Promotion of the products generally took place several months prior to the actual sale. The promotion of the Twin Towers and Shreveport Airport jobs took place before (with respect to Shreveport Airport) and before or shortly after (with respect to Twin Towers) Haden executed its ACE distributor agreement. Those two large sales constituted over 88% of Haden's total purchases of ACE products from Johns-Manville.

12. Haden constantly complained about the poor quality of ACE products and claimed that Haden's reputation was being ruined because of them. Haden had problems with ACE products on nearly every job. The ACE products did not sell well, and after Johns-Manville terminated Haden as an ACE distributor, Haden's overall sales and profits actually increased. In 1976, Johns-Manville quit manufacturing and selling ACE products altogether. During its manufacture, the ACE line was never profitable to Johns-Manville.

13. After Haden was signed as an ACE distributor, Johns-Manville signed a number of additional distributors for ACE architectural products around the country.

14. On or about July 24, 1970, Johns-Manville began to ship ACE products to Shreveport, Louisiana, for the Shreveport Airport project. These shipments continued through April 15, 1971. Along with each shipment Johns-Manville invoiced Haden for the value of that particular shipment. Payment for each was due 30 days from the date of shipment. The total amount invoiced to Haden by Johns-Manville for the Shreveport Airport project was $95,730.03. Haden refused to pay any of the invoices claiming that the panels it received from Johns-Manville were stained. Johns-Manville contended that the staining was caused by improper storage at the job site, while Haden contended that the staining was caused by the manufacturing and packaging process of Johns-Manville. Numerous documents were exchanged concerning the staining problem and numerous discussions took place. Johns-Manville employees made a number of trips to Shreveport concerning the staining problem.

15. Because of the staining controversy, Haden refused to pay Johns-Manville any money whatsoever. Johns-Manville, however, continued to ship Haden all the material it ordered for the Shreveport Airport project. Meanwhile, Haden advised Johns-Manville that it was not being paid by its customer. Yet, unknown to Johns-Manville, Haden was in fact paid every month by its customer, Southern Builders, Inc.

16. Ultimately, to satisfy the customer and settle the staining dispute, Johns-Manville took full responsibility for the stained materials. It paid for the painting which cured the staining problem.

17. In September, 1971, as the staining controversy was drawing to a close, Haden, for the first time, advised Johns-Manville that many of the panels were not cut square when delivered and had to be re-cut by Haden to the proper size on the job site. Haden never offered any supporting evidence of its cutting claim but nevertheless attempted to backcharge Johns-Manville $22,521.18. Johns-Manville was not able to prove or disprove Haden's cutting claim because of Haden's long delay in making it. The ACE distributor agreement specifically required that all claims based on defective products be made in writing within ninety days from the date of delivery. Haden made no attempt to comply with the agreement. Therefore, Johns-Manville refused to grant Haden's backcharge concerning the cutting of panels.

18. Following Johns-Manville's acceptance of the responsibility for curing the staining defect, Johns-Manville demanded that Haden pay it for the ACE materials shipped for the Shreveport Airport project. On January 4, 1972, Lohse advised Haden by telephone that if the invoices for the Shreveport Airport project were not paid by January 10, 1972, Haden would be terminated as an ACE distributor.

19. On January 10, 1972, no payment had been received from Haden; therefore, Lohse advised Haden by letter that it was terminated as a distributor for ACE products. The ACE distributor agreement permitted cancellation by either party on thirty days notice; therefore, the termination was effective February 10, 1972. The reason for termination was the refusal to pay the invoices for the Shreveport Airport project and the unwarranted and late backcharge for cutting.

20. Johns-Manville terminated Haden as an ACE distributor for valid business reasons.

21. Johns-Manville did not terminate Haden as an ACE distributor pursuant to any scheme by Johns-Manville to set the resale prices of ACE products.

22. There were no agreements, combinations, or conspiracies concerning Johns-Manville's termination of Haden as an ACE distributor.

23. Following its termination as an ACE distributor, Haden negotiated with M. C. Lipsman ("Lipsman") and Arthur H. Jenssen ("Jenssen"), Lohse's supervisors, in an attempt to be reinstated as an ACE distributor. As a result of the negotiations, Haden finally paid Johns-Manville $75,684.14 of the $95,730.03 that had been invoiced for the Shreveport Airport project. Haden paid Johns-Manville the reduced amount on or before February 9, 1972. Yet, negotiations for reinstatement of Haden as a distributor of ACE products continued after that date.

24. On February 22, 1972, Johns-Manville sent Haden a proposed distributor agreement. The proposed ACE agreement contained a provision which permitted Johns-Manville to deal directly with the ultimate user of the material on all jobs over $5,000 and to pay Haden the amount that Haden would have been paid under the previous ACE agreement less 5%. This provision was included to prevent Haden from withholding large amounts of money from Johns-Manville and from unilaterally reducing the amount owed by claiming sizable backcharges. Under the proposed agreement, Haden would still negotiate the contract and establish the price to be paid by the ultimate user.

25. Haden refused to sign the proposed ACE agreement. After Haden refused to sign the proposed agreement, Johns-Manville signed Payne & Howard, Inc., as its distributor in the Dallas market area.

26. Johns-Manville never agreed to reinstate Haden under the original terms of the ACE distributorship agreement by which it had previously been a distributor.

27. D. R. Haden's testimony concerning support was contradicted by his later testimony that a Johns-Manville sales representative gave Haden's salesmen assistance and

Haden was not refused support while a distributor. In addition, Johns-Manville employees made numerous trips to Shreveport, Louisiana, to inspect the Shreveport Airport project, and Johns-Manville took full responsibility for the staining problem on that job.

28. Haden claimed that it was terminated as an ACE distributor because Johns-Manville believed that Haden's resale prices were too high. The evidence, however, indicates that sales, which were made by other ACE distributors who were not terminated, were at prices higher than the prices quoted by Haden.

29. D. R. Haden claimed that he was advised in a meeting with Lipsman and Lohse that Haden was cancelled as an ACE distributor because of Haden's high resale prices. Both Lipsman and Lohse denied such a statement. Even in his deposition, D. R. Haden testified that the ACE cancellation was not even discussed at that particular meeting.

30. After Haden's termination as an ACE distributor, Johns-Manville agreed to sell Haden ACE panels only for the jobs that Haden had promoted or sold prior to its termination as an ACE distributor. This was Johns-Manville's normal policy. Johns-Manville requested Haden to provide Johns-Manville with a list of all such jobs; however, Haden refused to do so claiming that Johns-Manville's sales representative was aware of Haden's pending jobs.

31. The first job for which Haden ordered ACE panels after Haden's termination as an ACE distributor was the W. T. Grant store in Bossier City, Louisiana. While Haden claimed to have promoted the sale of ACE material for the W. T. Grant job, the order was actually referred to Haden by Pittsburgh Plate Glass Company. Furthermore, the job was initially promoted by the Johns-Manville Sales Department in New York. The W. T. Grant Company had specified ACE material for its buildings nationwide; which meant that the Johns-Manville ACE distributors in the areas where the buildings were constructed were able to sell the material without any promotional effort.

32. At the time the ACE panels were ordered for the W. T. Grant job, Haden was not an authorized distributor for ACE products. Johns-Manville had an authorized distributor for ACE materials for the state of Louisiana, Ted Barton & Associates ("Barton"). Johns-Manville's normal policy was to refer business to, and sell through, authorized distributors where possible.

33. On Tuesday, May 30, 1972, or Wednesday, May 31, 1972, Dorsey advised D. R. Haden and Hull that Johns-Manville would not sell Haden the ACE materials for the W. T. Grant store. At the same time Dorsey also advised D. R. Haden and Hull that they could purchase the material from Barton, which Haden refused to do. On June 2, 1972, Dorsey wrote Haden confirming his earlier notice that Haden could purchase the material from Barton. Haden refused to purchase the materials for the W. T. Grant job from Barton.

34. On June 5, 1972, Viking America sent its purchase order to Barton for the ACE materials for the W. T. Grant job. Simultaneously, Viking America cancelled its purchase order with Haden. On June 23, 1972, Johns-Manville shipped the ACE panels for the W. T. Grant store in Bossier City, Louisiana, to Barton.

35. On June 2, 1972, Lohse wrote two memoranda to Jenssen concerning transactions with Haden. One memorandum stated that in view of the fact that Haden had not provided Johns-Manville with a list of jobs that Haden claimed to have promoted before cancellation, Johns-Manville should refuse to accept any further orders from Haden and sell all jobs direct at Johns-Manville's suggested retail price. Lohse expressed concern that Haden would injure Johns-Manville in the market place because of Haden's exorbitant mark-ups. The other memorandum noted that Haden was selling the material to W. T. Grant at an exorbitant price without consulting Johns-Manville. The only evidence concerning requests that Haden consult with Johns-Manville concerned the list of jobs which Haden claimed to have promoted prior to being cancelled as an ACE distributor.

36. Haden never consulted Johns-Manville about its resale prices. D. R. Haden testified that he or his salesmen were the only ones who set the prices for Haden's sales of ACE products.

37. Johns-Manville sent suggested retail prices to its distributors. The suggested retail prices were not binding and there was no evidence that any distributor, including Haden, ever sold at the suggested retail prices.

38. The only detailed evidence of a sale of ACE panels by a distributor other than Haden concerned Barton's sale of ACE materials to Viking America. Barton purchased the material from Johns-Manville for $7,254.70. Barton's profit on the job was $3,967.08. The freight and tax paid by Barton to Johns-Manville was $1,104.20. Barton's price to Viking America for the product, therefore, was $10,117.58 ($7,254.70 + $3,967.08 – $1,104.20). The quantity of material sold by Barton to Viking America was 3,844 square feet. Hence, Barton's resale price was $2.63 per square foot ($10,-117.58—3,844 square feet). The suggested resale price for the material that Barton sold to Viking America was $2.30 per square foot. Barton did not sell the panels for the W. T. Grant job to Viking America at Johns-Manville's suggested retail price, but sold them at a higher price than the suggested one. Further, Barton set its own price. There was no evidence of an agreement, combination or conspiracy between Johns-Manville and Barton concerning Barton's resale prices to anyone, including the W. T. Grant job.

39. Lohse's recommendation to Jenssen concerning the refusal to sell to Haden those jobs which Haden claimed to have promoted prior to termination was rejected. As evidence of this rejection, on July 6, 1972, Dorsey advised Lohse that Haden had promoted and sold ACE material for a pump station job, and Jenssen advised Lohse that the panels for that job would be sold to Haden under the normal terms of sale. Johns-Manville shipped the panels for the pump station job to Haden on September 29, 1977. Once again, Haden refused to

pay Johns-Manville for the shipped panels. Thereafter, Johns-Manville refused to ship ACE material to Haden regardless of its promotional efforts.

40. Haden attempted to purchase ACE material for other jobs, which Johns-Manville refused to sell to Haden. By the time Johns-Manville determined whether Haden had promoted or sold those jobs, the payment for the pump station job was overdue. In each instance Johns-Manville referred Haden to the authorized ACE distributor for the area in question; but Haden refused to purchase the materials from the authorized ACE distributor for the area in question; but Haden refused to purchase the materials from the authorized ACE distributor.

41. Beginning in 1966, Haden had distributed another line of Johns-Manville products, which were similar to the ACE products, but were handled by another division of Johns-Manville. Those products were referred to as the master stocking products. On January 20, 1972, Haden signed its first written agreement with the master stocking division. The master stocking products were manufactured and sold by a division of Johns-Manville separate and apart from the division which manufactured and sold the ACE products; however, some of the Johns-Manville sales representatives in various geographic areas serviced both products. The Johns-Manville sales representative who initially worked with Haden was the representative for both products.

42. In December, 1972, the credit department of Johns-Manville decided to put Haden on a CIA/COD basis because of Haden's refusal to pay for the pump station job and others. In September, 1973, Johns-Manville sued Haden to recover the debt incurred in the pump station transaction.

43. In early 1974, the division of Johns-Manville which marketed the ACE products and the division which marketed master stocking products were combined. Lohse became product marketing manager for both lines of products.

44. In or about September, 1974, the Johns-Manville sales representative in Dallas, F. M. Royer ("Royer"), recommended that Haden be terminated as a distributor for master stocking products. Royer made his recommendation to his immediate superiors, G. R. Trudell ("Trudell") and G. D. Burns.

45. Two complaints involving master stocking products concerning two jobs which were sold to Haden began to surface. Because of Royer's recommendation and the prospect of further litigation with Haden concerning the two problem jobs, Trudell made the decision to terminate Haden as a master stocking distributor.

46. Trudell directed Lohse, who was then the product marketing manager for both the master stocking products and ACE products, to notify Haden in writing that it was being terminated as a master stocking distributor. Following instructions, on November 27, 1974, Lohse wrote Haden a termination letter.

47. Johns-Manville terminated Haden as a master stocking distributor for valid business reasons.

48. Johns-Manville did not terminate Haden as a master stocking distributor pursuant to any scheme by Johns-Manville to set the resale prices of its distributors.

49. Johns-Manville had no agreement with any of its distributors concerning their resale prices of master stocking products.

50. There were no agreements, combinations or conspiracies concerning Johns-Manville's termination of Haden as a master stocking distributor.

51. After receiving its notice of termination, Haden ordered a master stocking product, Fireglaze Stonehenge, to be used on a post office building in Victoria, Texas. Johns-Manville agreed to sell Haden the Fireglaze Stonehenge at one price, but later refused to sell at the quoted price because there had been a price increase between the date of Haden's order and the date of shipment. Haden never purchased the Fireglaze Stonehenge.

52. Johns-Manville actually sold Fireglaze Stonehenge at prices different from the price quoted to Haden. However, such

sales were to Bonitz Insulation of Alabama for shipment to Nashville, Tennessee, to Bonitz Insulation of Alabama for shipment to Columbia, Tennessee, to Lumberman's Brick & Supply, Omaha, Nebraska, for shipment to Des Moines, Iowa, and to MFG Associates, Inc., St. Louis, Missouri, for shipment to Granite City, Illinois. Haden's normal trading area was the states of Texas, Oklahoma, Arkansas and Louisiana. None of the aforementioned purchasers or sales were in Haden's normal trade area.

53. Haden's income for the years 1966 through 1975 is listed below. Haden operated through a proprietorship which was on a calendar year tax basis and a corporation which had a fiscal year tax basis beginning July 1 and ending June 30. The total Haden income can be calculated by adding half of the proprietorship income for the years immediately preceding and following each corporate fiscal year to the income for the corporation for that fiscal year. Those figures show as follows:

| Calendar Year | Income (½ Income) | Fiscal Income | Total Haden Income |
|---|---|---|---|
| 1966 | 23,046 (11,523) | 4,497 | 33,508 (11,523 + 4497 + 17488) |
| 1967 | 34,977 (17,488) | 13,361 | 46,925 (17488 + 13361 + 16076) |
| 1968 | 32,152 (16,076) | 14,554 | 66,329 (16076 + 14554 + 35699) |
| 1969 | 71,398 (35,699) | 29,497 | 99,980 (35699 + 29497 + 34784) |
| 1970 | 69,569 (34,784) | 10,058 | 100,970 (34784 + 10,058 + 56128) |
| 1971 | 112,256 (56,128) | 1,014 | 106,045 (56128 + 1014 + 48903) |
| 1972 | 97,806 (48,903) | · 88,157 | 137,060 (48903 + 88157) |
| 1973 | | | |
| 1974 | | 224,641 | 224,641 |
| 1975 | | 238,655 | 238,655 |

54. Haden's damages were calculated in terms of gross profit only.

55. Johns-Manville's termination of Haden as an ACE distributor and as a master stocking distributor was followed by the appointment of a new distributor for each line of products. There was no evidence that Johns-Manville required the distributors who replaced Haden to sell the products at a price lower than the prices at which Haden had attempted to sell the Johns-Manville products, or that Johns-Manville had an agreement with the replacement distributors concerning resale prices.

## CONCLUSIONS OF LAW

■ 1. Johns-Manville's unilateral decision to terminate Haden as a distributor of ACE architectural products and master stocking products did not violate the antitrust laws. *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Burdett Sound, Inc. v. Altec Corp., Inc.,* 515 F.2d 1245 (5th Cir. 1975); *Ace Beer Distributors, Inc. v. Kohn,* 318 F.2d 283 (6th Cir. 1963), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); *Gray v. Shell Oil Co.,* 469 F.2d 742 (9th Cir. 1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973); *Garrett's Inc. v. Farah Mfg. Co., Inc.,* 412 F.Supp. 656

(D.S.C.1976); *Diehl & Sons v. International Harvester Co.*, 426 F.Supp. 110 (E.D.N.Y. 1976); *Keener v. Sizzler Family Steak Houses*, 424 F.Supp. 482 (N.D.Tex.1977).

■ 2. Haden failed to prove any combination, conspiracy or agreement between Johns-Manville and any third party concerning Johns-Manville's actions toward Haden; therefore, even if Johns-Manville had violated the antitrust laws, such violation had no causal effect with respect to its termination of Haden. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Wilson v. I.B.E. Industries, Inc.*, 510 F.2d 986 (5th Cir. 1975); *Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711 (S.D.N.Y.1969), *aff'd*, 417 F.2d 621 (2nd Cir. 1969); *McKesson & Robbins, Inc. v. Charles Pfizer & Co.*, 235 F.Supp. 743 (E.D.Pa.1964).

■ 3. Even if Johns-Manville had required its distributors to sell at suggested resale prices, which it did not, there was no proof that such conduct was unreasonable. Hence, there was no Sherman Act violation. *Continental T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *Eastern Scientific Company v. Wild Heerbrugg Investments, Inc.*, 572 F.2d 883 (1st Cir. 1978).

■ 4. Haden failed to show any recoverable damages. Haden's only evidence of damage concerned losses of gross profits, not net profits, and dealt with particular sales transactions, not an injury to its overall business or property. *Wolfe v. National Lead Co.*, 225 F.2d 427 (9th Cir. 1955), *cert. denied*, 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955); *see also, Brunswick Corp. v. Pueblo Bowl-o-Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Furthermore, Haden was not damaged by the loss of the ACE or master stocking lines.

■ 5. Haden failed to satisfy the requirement of § 2(a) of the Robinson-Patman Act that there be two actual consummated sales before a cause of action for price discrimination will lie. *M. C. Mfg. Co., Inc. v. Texas Foundries, Inc.*, 517 F.2d 1059 (5th Cir. 1975), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Business Equipment Center, Ltd. v. DeJur Amsco Corp.*, 1978–1, Trade Cases ¶ 61,822 (D.D.C.1978).

■■ 6. Assuming arguendo, that Haden may have been discriminated against in the price of Fireglaze Stonehenge, such discrimination did not have a probability of substantially lessening competition as is required by § 2(a) of the Robinson-Patman Act. *M. C. Mfg. Co., Inc. v. Texas Foundries, Inc.*, 517 F.2d 1059, 1066 (5th Cir. 1975), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 237 (D.C. N.J.1976). The persons receiving the different prices must be in actual functional competition with one another. *F. T. C. v. Borden Co.*, 383 U.S. 637, 86 S.Ct. 1092, 16 L.Ed.2d 153 (1966); *Refrigeration Engineering Corp. v. Frick Co.*, 370 F.Supp. 702, 712 (W.D.Tex.1974). The sales to the more favored buyers cited as being discriminatory (to Bonitz Insulation of Alabama, Lumberman's Brick & Supply and MFG Associates on one hand and to Haden on other) were well outside of Haden's normal trading area. Thus, there was no violation of the Robinson-Patman Act.