**KAY INSTRUMENT SALES CO., Inc. and Nathan A. Karlin, Plaintiffs,**

v.

**HALDEX AKTIEBOLAG and Automotive Clock Repairs, Inc., Defendants.**

No. 68 Civ. 1647.

United States District Court
S. D. New York.

June 11, 1968.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiffs, H. Richard Wachtel, Grant S. Lewis, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendants, James V. Hayes, Peter J. Gartland, Louis C. Lustenberger, Jr., New York City, of counsel.

WYATT, District Judge.

This is a motion by plaintiffs Kay Instrument Sales Co., Inc. (Kay) and Nathan A. Karlin (Karlin), president and principal stockholder of Kay, for a preliminary injunction under 15 U.S.C. § 26, a part of the antitrust laws.

Kay is a New York corporation with its business principally in the New York City metropolitan area (the area). Plaintiff Karlin is a resident of New York. The defendants are Haldex Aktiebolag (Haldex), a Swedish corporation, and Automotive Clock Repairs, Inc. (Automotive), a New York corporation.

The complaint has three counts. For present purposes, only the first count need be considered.

The first count charges in substance that Kay has for many years been buying taximeters (meters) from Haldex and has been the exclusive distributor for Haldex meters in the area, that a new type of meter has been developed by Haldex to meet a special need and has also been developed independently by the chief competitor of Haldex in the area, that the new meters are just about to be sold by the two competitors, that Haldex and its competitor have made an agreement fixing the prices at which the new meters are to be sold in the area, that Kay refused to enter this price fixing agreement, that following such refusal by Kay (and presumably because of it) Haldex gave notice of the transfer to Automotive—effective May 30, 1968—of the distributorship for Haldex meters (thereby terminating sales to Kay), and that if this step is carried out Kay's reputation will be destroyed and irreparable injury done to Kay.

The relief demanded in the complaint under the first count is that the Court declare that there has been a violation by defendants of the Sherman Act (15 U.S.C. § 1 and following), that Haldex be enjoined from refusing to sell meters to Kay, that Haldex and Automotive be enjoined from performing any agreement under which Automotive will act as distributor in the area of Haldex meters, and that plaintiffs have judgment for treble damages. Plaintiff has demanded trial by jury.

By the present motion plaintiffs ask for a preliminary injunction (a) enjoining Haldex from refusing to sell meters to Kay and (b) enjoining Haldex and Automotive from performing any agreement under which Automotive will act as distributor of Haldex meters in the area.

At the argument of the motion, neither side asked to present testimony or other evidence at a hearing but rested on the affidavits and other papers submitted. The findings of fact herein are for the most part based therefore on statements in the papers for one side, not denied by the other side. The complaint is not verified but in some respects has been relied on in the findings of fact.

■ Section 16 of the Clayton Act (15 U.S.C. § 26) authorizes a private person "to sue for and have injunctive relief * * * against threatened loss or damage by a violation of the antitrust laws * * *". The same section authorizes a preliminary injunction. In determining whether to issue a preliminary injunction, however, there is nothing exceptional by reason of the presence of antitrust elements; the normal principles of equity are applicable.

Haldex makes its meters in Sweden and ships them to the United States and many other countries; in the United States the Haldex meters are sold under the name "Halda", Kienzle Uhrenfabrick (Kienzle) makes competing meters in Berlin in West Germany and ships them to the United States and elsewhere; the Kienzle meters are sold under the name "Argo". The distributor of Argo meters in the area is Efficient Instruments Corp. (Efficient or Argo).

Until October 15, 1966, the President ("Managing Director") of Haldex was Klercker; since October 12 or 15, 1966 the President has been Lindbeck. At all relevant times the Export Manager of Haldex has been Pettersson.

Kay is owned by Nathan Karlin and his wife. Kay and its predecessors (also

owned by the Karlin family) have been selling meters in the New York area since 1923. Karlin is the President of, and chief figure in, Kay; a younger brother is in the business; a son (a professional engineer) is an officer, has been active in the past in the business and particularly in its technical aspects, and while now employed elsewhere is said to be proposing to reenter the business.

In New York City, the principal part of the area, there are 11,784 taxicabs, of which 4,968 are individually owned (and presumably are normally driven by the owner) and 6,816 are owned in "fleets", that is, a number of cabs are owned by a single owner and driven by employees. The figures have been supplied to the Court by the Hack Owners Bureau of the Police Department. They are not in the papers but are roughly consistent with some estimates therein (Karlin affidavit of April 30, 1968, Ex. E. (p. 3)).

From early 1947 Karlin sold and serviced Haldex meters in the eastern part of the United States. This was done by arrangement with John Ohmer who was distributor for Haldex in the United States. Ohmer died and in 1951 Haldex and Kay made a contract for the sale of meters exclusively to Kay for resale in a territory including the area here in suit. A further agreement was made in 1953 and in or about December 1955 there was an amendment to the contract which, among other things, made it renewable automatically subject to termination on six months notice. No copies of any contracts or amendments are supplied by plaintiffs. The defendants submit a copy of an agreement dated February 25, 1956, which is said to be the last written agreement between Haldex and Kay. Plaintiffs are silent in the face of this evidence and I must conclude therefore that the written agreement of February 25, 1956 was in fact the last agreement between Haldex and Kay. This agreement expired by its terms on September 1, 1957 and had no provision respecting renewal.

Whatever the status of a written agreement between them, Kay has been buying meters from Haldex and no one else and has been reselling and servicing them in the area since at least 1951. Haldex in the same period has sold to no one in the area other than Kay.

Kay has, until at least recently, sold more meters in the area than anyone else. It accounts for about 30% of the meters in taxis in the area. The principal competitor of Key is Efficient which has the exclusive sale of Argo meters, made and shipped here by Kienzle. Kay and Efficient sell "most" of the meters sold in the area.

Apparently the owners of taxi fleets believed that it was a practice of some of their drivers to do "stick-up" driving, that is, to ride a passenger without engaging the meter by "putting the stick down"; this meant that a fare would be collected which, because the meter made no record, could be pocketed by the driver without detection.

At some time early in 1966 some owners told Karlin that if a meter could be devised to prevent the practice described, virtually all fleet owners would buy it.

Karlin told Haldex of the market for an "anti stick-up" meter and "generally described" to Haldex such a meter actuated by pressure of the passenger on the seat. During 1966 Haldex and Kay worked on the problem and were in correspondence about the new meter, as will be more fully described.

Some time before September 1, 1966, Haldex sent one or more models to Kay which installed them for testing in taxicabs. Kay developed the method of installation of the new meters, how to connect the parts to the cab. During the tests, people from Haldex came to observe and to consult with Kay. Kay suggested design changes. The engineer son of Karlin took some interest. Kay showed the model to the fleet owners and according to Haldex made a "fine showing" but, to the dismay of Haldex, promised delivery of the new meters in

30 days from the date of orders. A committee of fleet owners decided to test the Haldex new model for 90 days. Meanwhile Haldex was questioning Kay about how many new meters could be sold; about possible prices, and other information significant for a new product.

About September 1, 1966 or not long thereafter in September, the design and mechanical features of the Haldex new meter were made final.

Some time before September 1, 1966, Kay and Haldex learned that Kienzle was developing an Argo "anti stick-up" meter rumored to operate with electronics. Karlin's engineer son believed that an electronic system could be easily "jammed" by a small, inexpensive device; this was reported to Haldex who realized that it was a competitive disadvantage for Kienzle since it would defeat the whole purpose of the "anti stick-up" meter. Kay also reported to Haldex that two other competitors were working on new meters.

Under date of September 1, 1966 Klercker wrote to Karlin. The tone of the letter is suggestive of a joint venture or partnership of Haldex with Kay in the development and promotion of a new meter. The principal point made by Haldex was that orders from the fleet owners had to be booked by Kay as soon as possible for as many meters as possible. Evidently Haldex felt that Kay could book the orders from the fleet owners even before knowing the price but Kay was promised a price "in a few weeks". As explained to Kay, it was "most important" to Haldex to know that a "substantial" number of new meters would be ordered before Haldex invested "a lot of money" in the new tools required to make the new meters. Haldex felt that Kay should book orders for "successive deliveries" of 300 to 400 meters per month rather than the blanket 30 day delivery promised by Kay for an unspecified number. Haldex expressed interest in the belief of Karlin's son that the rival Argo electronic meter could be "jammed" and asked that the son have a

jamming apparatus made up "so that we can demonstrate how you tamper with the Argo system."

Kay on September 9, 1966, obtained "temporary approval" from the New York Police Department for use of the new meters.

The first eight new meters off the production line were shipped to Kay on September 16. Kay was to install these in cabs of fleet owners for a test period.

Then on September 19, Klercker wrote to Karlin about a talk which he had had with the sales director of Kienzle. The subject in Karlin's letter of chief significance for this motion was the fixing between Haldex and Kienzle and their respective New York distributors (Kay and Efficient) of the sale price of new meters to the fleet owners in the area, that is, the resale prices on new meters of Kay and Kienzle. The nature of the price fixing arrangement is best shown by quoting the Klercker letter ["Argo" in the letter usually refers to Kienzle]:

"The Argo sales director has been in contact with their New York representative at my request to find out what price the new type of meter should fetch. Both Argo and ourselves fully agree that we have such a valueable apparatus for the fleet owners, that there is no point in giving it away and that anyway due to development costs, patent costs and considerably higher cost of production, a much higher price than for a normal taximeter is called for. Argo are prepared to fix a price of US $450.—per meter plus the cost of fitting and they are prepared to limit the price to be paid for the old taximeter taken in exchange to US $40.—. I have said, that we are prepared to see to it that the same price level is kept by you. We feel that this is the right price level and as long as the two of us really stick to it, then the fleet owners cannot play one against the other and anyway they are certainly getting a lot of value for their money.

"In this connection I was told that their New York representative had

been in touch with you in regard to service charges. He had suggested, I was told, that both of you want to increase your service charges for the obvious reason that your costs have gone up considerably." I was given to understand that your reply to their New York representative had been that he was welcome to increase his prices, but you were not going to do so. May I suggest that I feel that you made a mistake there. In the first place I remember you telling me that you do not make any money on service, only on fitting and refitting, and secondly I always feel that if and when it is possible to have some form of a friendly cooperation with your worst competitor, then this is something to be grateful for. In my opinion, consequently, you ought to contact Argo's New York-man and suggest that you seriously discuss service charges and prices and fitting costs and allowances for meters taken in exchange. I want to avoid either one of you starts indicating prices for the new meters, which are too low, because both of you believe that the other will come up with a low price. Do not forget that you have said yourself, that this is the chance of a lifetime to make big sales and good money. I repeat that US $450.— should be the correct price and US $40.—again a very reasonable sum to pay for an old meter. I also think, that the fitting charge, although in practice your cost of fitting would not be all that much increased, should be substantial and also agreed upon between the two of you in New York. I know perfectly well, that officially this kind of arrangements is not allowed, but you know as well as I do that such arrangements exist all over the world including America.

"I reckon that you can have the MMM meter complete with all passenger detector parts in your shop for US $340.—. This will give you a profit per meter, if you allow as much as US $40.—for the old one taken in exchange, of US $70.—plus the profit you can make on the job of fitting, which I am sure could amount to not less than US $10–15.—. This, as I see it, should be very satisfactory and if you manage to sell 3.000 you have a profit of a staggering of US $240.-000.—. If our meter and system is superior than you may reach even higher figures because, as I see it, there are between 7.000 and 8.000 fleet owned cabs and they would all be wanting the new type of meter.

"Please let me hear from you immediately and show me that you will cooperate with the Argo out-fit. You will then still compete, but not on price but on quality, service and salesmenship and good contacts with the fleets and this is where you should score.

"I am sure there is no hurry at this moment to give any price indication to the fleet owners, but please make sure that neither you nor the Argo man gives any indication below the prices stated in this letter and which through the sales director of Kienzle I know that their New York Argo man is interested in keeping."

In short Haldex and Kienzle agreed that the resale price in the area would be $450 per new meter, that the maximum allowance for old meters traded in would be $40, and that they would see to it that such prices were maintained by their respective distributors, Kay and Efficient. There was no agreement as to the price at which the new meters would be sold by Haldex to Kay and by Kienzle to Efficient. It would have been simpler for Haldex and Kienzle to have made such an agreement but, as a practical matter, it could not be done. This was because the new Halda meter to be sold to Kay was a complete unit whereas the new Argo meter was not comparable because as sold to Efficient it was not complete, lacking the "clock" and the "anti stick-up" device. It was planned that Efficient would, for its own account, buy in the United States the "clock" and the "anti stick-up" device. Therefore the Haldex-Kienzle

agreement to fix prices on the new meters could only be made effective by fixing the *resale* price in New York, despite the fact that sale of the meters to Kay and Efficient passed title to them. To fix resale prices meant as a necessary corollary that allowances on the old meters traded in had to be controlled; otherwise, either competitor could vary the agreed resale price by manipulating the trade-in allowance.

Karlin wrote a long letter to Klercker under date of September 27, 1966, replying to the price fixing proposals Klercker had made. Karlin objected strongly to the proposals, not because they might violate the law, but because he felt that they were against the selfish interests of Kay. The chief points made by Karlin were that the price of $340 to him was too high, that the resale price of $450 was too high, and that the net margin of $70 to him ($110 less the $40 allowance) was too low. What Karlin wanted was a price less than $340 and no control by Haldex of his resale price (and the incidental allowance). If Haldex would give Kay a "reasonable price", then Kay would "sell the meters, take trades at the lowest possible basis [that is, keeping the resale price as high as possible] and keep the selling price within saleable reasonable limits * * *". Karlin wanted to have nothing to do with Efficient, the Argo distributor; Karlin argued that if Kay and Efficient had the same resale price, Efficient would make more money because its costs would be lower due to their obtaining the "clock" and the "anti stick-up" device in the United States. He also felt that Efficient in the past had offered meters to Kay's customers "at a much lower price".

Klercker replied to Karlin under date of October 7, 1966. The letter really amounts to a long argument that the prices and allowances proposed by Haldex and Kienzle are in Kay's interest and that Kay should accept and make a deal at once with Efficient in New York. Klercker does offer, however, to make one change as an inducement to Karlin to make the deal with Efficient. Klercker says that if Kay will try to agree on prices with Efficient and if the two then feel that a $40 trade-in allowance is too little, then the "suggestion" is that "the maximum price paid for exchange meter could possibly be $60". In that event, Haldex would consider lowering its price to Kay to $320. Klercker emphasizes, however, that "a condition for the lower price just mentioned is that you talk to the Argo-man [Efficient] and try to find a solution between you which is acceptable". Other parts of the letter were as follows:

"It is an old established fact that it is at times as important if not more so to know and get on with ones competitors as it is to know and get on with ones customers. * * * If we for a moment take it for granted that the Argo-man does use all the tricks you are talking about and does sell meters at a ridiculously low price, then it would seem to me all the more important to try and break this evil circle. What will happen on what you call 'our chance of a life time to sell meters', if you are going to have a cat and dog fight with the Argo-man? As I see it, the result will be that neither of you will make any money and possibly you even less than the Argo-man. This is assuming that the cost of the meter to the Argo-man is lower than the cost of the meter to you. I would personally not be too sure about this. However, assuming that this is the case, then in all logic it is even more important for you to come to some form of an arrangement with the Argo-man. Would not he otherwise just love to see a cat and dog fight, where he can undersell you and still make at least some money * * *"

\* \* \* \* \* \*

"I hope you realize that my suggestion for a reasonable cooperation between the Argo-man and yourself is in the interest of all, so I really want you to think this over very carefully. We do not intend to loose this business to Argo (if it comes off at all) due to a

price war between you and the Argoman and we do not want to see you loose the better part of your margin due to such a price war."

In reply to Klercker's October 7 letter, Karlin wrote to Haldex under date of October 14, 1966. No copy of this letter is supplied by either side. Karlin quotes in his affidavit from the letter, from which quotation it appears that he was still trying to get "a final price" to him without any fixed resale price, promising that he would then "determine a reasonable selling price in line with * * * all competitors" and would not compete "on price only" and would not "cut prices just to sell meters".

Klercker ceased to be President of Haldex on October 12 or 15, 1966. Why this came about is not explained and there are several versions for defendants of how it did come about. The affidavit of Pettersson states at one point (p.2) that Klercker "resigned, October 12, 1966", at another point (p.3) that he "was removed from office on October 12, 1966", and at another point (p.7) that he "was replaced". The affidavit of Lindbeck states (p.2) that Klercker "resigned * * * October 12, 1966". The formal notice of Haldex to Kay (and presumably to other distributors) states that Lindbeck was appointed "Managing Director" (President) "as from October 15, 1966". Klercker remains, however, a director of Haldex.

By October 7 Kay had installed for test purposes two of the new meters in fleet cabs. The new "seat actuated" meter was a radical departure and, of course, required new methods to put it in the cab. Naturally Kay found—as it reported to Haldex—that the seat starting equipment caused installation to take a long time, especially because the whole process had to be learned by trial and error and by experimenting. Kay reported that they "were learning the best way to do it and will improve in time as we do more".

Continuing from early in the year 1966 there had been close collaboration on a technical level between Kay and Haldex, Kay reporting, by letter and cable, observations of tests conducted and "bugs" encountered; Kay made many suggestions, a number of which were accepted by Haldex and changes made in the new meter. The collaboration extended to the most minute particulars, for example, the size of drill holes, the diameter of small springs, etc. From time to time one or more technicians from Sweden worked with Kay in New York.

By November 7, ten new meters had been installed by Kay in fleet cabs for test purposes. The committee of fleet owners selected the cabs to be used for the tests; most of the test cabs had not been using Halda meters. This appeared to Kay to be a competitive advantage. By report dated November 7, Kay related to Haldex the results of tests in the cabs to that date, especially the technical problems met and how they were solved.

There were cable and telephone exchanges between Karlin and Lindbeck, apparently several, dealing with the price on the new meter, Karlin trying to reduce the price to him.

Lindbeck finally decided in March 1967 to send Pettersson to New York.

According to the Pettersson affidavit (p.4) submitted on this motion, he was sent to New York in order to "locate a distributor to take Kay's place". If this was his true purpose, which is doubtful, it was concealed from Kay and is not reflected in writings made at the time.

While Pettersson was winging his way to New York, Lindbeck was writing to Kay under date of March 7, 1967, that Pettersson was being sent to reach a "reasonable solution" of the problem of the meter price to Kay.

The March 7 letter of Lindbeck to Karlin is inconsistent with the present claim in Lindbeck's affidavit that because of Kay's "financial position" and other defects he sent Pettersson to New York "to ascertain whether a new distributor could be found" and to get legal

advice whether they could "terminate Kay's distributorship".

According to the March 7, 1967 letter of Lindbeck to Karlin, the problem was not the financial position of Kay nor finding a new distributor. The problem was that "the profit angle may not be forgotten" neither by Kay nor by Haldex and that Haldex was determined that sales of the new meter should not result in Haldex being "without a profit" while there was a "gain" to Kay as "the only one". Lindbeck stressed that the "profit point of view" was "obviously *the* most important thing" (emphasis in the original). So far as the letter to Kay is concerned, there is not the slightest hint that Kay's performance as a distributor was not satisfactory. The difference between Lindbeck and Karlin was over the sale price of the new meter to Kay; Lindbeck appears to have followed the same line as Klercker and expressed regret that Karlin should press for the "lowest price".

While Pettersson was in New York in March 1967, Karlin introduced him to Miner Industries, Inc., with whom Kay was negotiating for a joint venture in order to finance the expected heavy new meter business. According to Pettersson, Haldex then tried to get Miner to take over as distributor but Miner refused. Pettersson says that in March 1967 he "contacted a potential distributor" in New York but no name is given. He says that he consulted New York counsel and later received a "formal opinion" that Kay could be cut off as a distributor "upon reasonable notice"; no copy of the opinion is supplied.

On March 21, 1967, the Police Department approved the new Halda meter "on a permanent basis". The approval letter is addressed to Karlin.

In April 1967, Karlin and Lindbeck met in Sweden. Lindbeck says that he told Karlin that Haldex "was contemplating replacing him" and refused to execute a contract proposed by Karlin. It appears to be true (because confirmed by a writing at the time) that Lindbeck would not execute the contract Karlin desired. That Lindbeck told Karlin that Haldex was thinking about replacing Kay is highly doubtful. Karlin's letter to Lindbeck of April 14, 1967—after he had returned from Sweden—does not read like the letter of a man who had been told such a thing.

From March through December, 1967, introduction of the new meters was delayed because there were labor negotiations between the fleet owners and the drivers and because, related thereto, the municipal authorities were considering a taxi fare increase (which eventually came about).

The technical cooperation between Kay and Haldex, and the testing of the new meters in cabs in New York continued during 1967.

In October 1967, the International Taxicab Association had its convention in New Orleans. Kay had a booth there to promote Haldex meters, featuring the new "anti stick-up" meters. Kay distributed handbills over its name with pictures of the new meter and with many promotional statements about it, including reference to the New York Police Department approval. Kay advertised the new Halda meter: "Fleet operators asked for it and we built it for them." Kay emphasized: "No more riders without registering fare".

In late December or early January, 1968, there was a new labor contract in the taxi industry and an increase in fares. The demand for the new meters then resumed.

According to Lindbeck, in early 1968 Haldex got "advice" from New York that its "position was jeopardized" and that "several fleet operators in the City of New York had decided not to do business with Kay". These statements are in no way substantiated and cannot be accepted. There is nothing in writing by way of support nor is the source of the "advice" nor the fleet operators in any way identified. Karlin denies that he lost any fleet business and submits two statements from fleet owners, in substance that they would buy the new meters from Kay. According to Pettersson

there were "complaints" by mail about Kay's service from fleet owners. No such complaints were submitted or otherwise established.

Pettersson says that a fleet owner "by letter" recommended Automotive as "a prospective distributor". No such letter of recommendation was submitted.

In February 1968, Karlin again met Lindbeck in Sweden. Evidently they had been talking about Kay's financial ability; Karlin showed Lindbeck two irrevocable letters of credit aggregating $100,000 and had made arrangements for $150,000 more in letters of credit.

In February 1968, Pettersson came to New York, according to his affidavit, "to find an immediate replacement for Kay". The decision to cut off Kay had been made before he left Sweden, doubtless as a result of a failure to reach any agreement with Karlin while Karlin was in Sweden in February 1968.

On February 28, 1968, Pettersson told Karlin in New York that Haldex would "soon" be changing "its method of distribution in New York City". He did not at that time cut Kay off because he wanted Kay to continue to service Halda meters.

Defendant Automotive has been selling Argo meters made by Kienzle, buying them from Efficient and reselling them to individual—not fleet—owners. Automotive had an agreement with Efficient covering its Argo activities. Automotive has been servicing the meters of all makers, including Haldex. It is evidently a business of modest size in a small garage; Karlin says, without contradiction, that the Dun & Bradstreet rating of Automotive is a net worth of less than $20,000.

Pettersson in March 1968 while in New York offered Automotive the distributorship of Haldex and the offer was accepted. After returning to Sweden, Pettersson wrote Kay on March 5 that Haldex was about to change "the present distribution pattern" because it had been "revealed to us through different sources that a great number of po-

tential customers for taximeters in New York City are for different reasons reluctant to do business" with Kay. None of these "sources" or "customers" have ever been identified.

On May 29, Pettersson notified Kay that its distributorship would be terminated on May 31.

In the week of April 15, 1968, Automotive publicly announced that it was the new distributor for Haldex. It then hired two of Kay's employees, described by Karlin as "key" men.

This action and this application followed.

■ A preliminary injunction ought to be issued to keep things just as they are until the merits can be decided, *if* plaintiffs carry the burden to show that "the balance of hardships tips decidedly" toward them and that there are serious questions going to the merits sufficient "to make them a fair ground for litigation and thus for more deliberate investigation". Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953), cited with approval Unicon Management Corp. v. Koppers Co., 366 F.2d 199, 204–205 (2d Cir. 1966).

■ There is no doubt but that a preliminary injunction should issue here.

Seldom has a price fixing agreement, with full knowledge that it violated the law, been evidenced more clearly than in the case at bar. Klercker stated: "officially this kind of arrangements is not allowed, but you know as well as I do that such arrangements exist all over the world including America".

In the face of this evidence, the showing for defendants is weak indeed.

According to Pettersson, he concluded in 1955–1956 that "Kay should not be continued as exclusive distributor". If this means that twelve years ago he believed Kay should be eliminated as a Haldex distributor, there is no claim, and certainly no evidence, that he ever communicated his belief to anyone. Until the dispute about the price fixing agreement, the evidence indicates a satisfactory relationship between Haldex

and Kay. The affidavits of Pettersson, Lindbeck and Behrens (president of Automotive) contain general denials of any price fixing agreement but they do not deny that such an agreement was made; the suggestion is that Haldex has never "abided" by any such agreement. No writings are submitted showing any repudiation of the agreement made by Klercker with Kienzle; indeed, no affidavit of Klercker is submitted although he is a director of Haldex. No affidavit of Kienzle nor of Efficient is submitted; it is true that they may not be under the control of defendants but Efficient is subject to the process of this Court; it is not shown for defendants what efforts, if any, were made to get affidavits from Kienzle or Efficient. In this connection, it seems of some significance that when Haldex replaced Kay, Haldex selected as replacement a company allied (through Efficient) with that same Kienzle with which the price fixing agreement had been made.

It also seems significant that no innocent excuse for cutting off Kay is shown. It is suggested that there were complaints from fleet owners about the service given by Kay, but there is no evidence submitted nor even any identification of the complaints. It is suggested that Kay is a poor credit risk. There is no evidence from which any such finding could be made. It also seems strange that, for this reason, Kay, with letters of credit for $250,000 should be replaced by Automotive, having a net worth of less than $20,000; Haldex apparently thinks so little of Automotive as a credit risk that initial purchases of Automotive of as little as $3,000 have been required by Haldex to be covered by a letter of credit.

The irreparable injury to Kay is apparent.

After selling Haldex meters for over 20 years and after the closest collaboration in developing, perfecting and promoting the new "anti stick-up" meter, Kay is suddenly cut off and its organization made the prey of the selected replacement. Unless restrained, the selected replacement will alienate the customers, hire the employees, and destroy the business of Kay before a trial on the merits.

Automotive suggests that it will be greatly hurt by a preliminary injunction because it has terminated its subagency agreement with Efficient for Argo meters and Efficient has advised that it will not sell Argo meters to Automotive. In the past Automotive has resold Argo meters to individual taxicab owners and has serviced Haldex, Argo and perhaps other meters. Kay offers, in the event of a preliminary injunction, to make the same kind of subagency arrangement with Automotive for Haldex meters as Automotive had with Efficient for Argo meters. If Automotive prefers, this will be made a condition of the preliminary injunction, the arrangement with Kay and Automotive to be in effect until a decision on the merits.

Of course, what has been written is not a decision on the merits. Defendants may have been to some extent pressed to defend this application on short notice. The home base of Haldex is in Sweden, which itself may make more awkward its defense to an application of this character. Defendants may well prevail on the merits. Enough has been shown, however, to require maintaining Kay as the distributor of Haldex until there can be a "more deliberate investigation". Any party is at liberty, of course, to apply for a preference for trial under Calendar Rule 10(e) of this Court.

The findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a) are contained in what has been written above.

The motion is granted. Settle order, including provision for security (Fed.R. Civ.P. 65(c)). Suggestions as to the amount of security to be required will be entertained.

So ordered.