**INTERPHOTO CORPORATION,**
**Plaintiff,**

**v.**

**MINOLTA CORPORATION, Defendant.**

**No. 69 Civ. 130.**

United States District Court
S. D. New York.
Jan. 30, 1969.

---

Donovan, Leisure, Newton & Irvine, New York City, for plaintiff; Sanford M. Litvack, New York City, of counsel.

Whitman, Ransom & Coulson, New York City, for defendant; Forbes D. Shaw, Richard A. Lang, Jr., New York City, of counsel.

## OPINION

HERLANDS, District Judge:

Plaintiff, Interphoto Corporation (hereinafter "Interphoto"), moving for a preliminary injunction under 15 U.S.C. § 26, § 16 of the Clayton Act, seeks to restrain *pendente lite* defendant Minolta Corporation (hereinafter "Minolta"), its agents, servants, employees and those persons in active concert or participation

with any of them (a) from refusing to sell Minolta photographic equipment to Interphoto, and (b) from terminating Interphoto's distributorship of Minolta's products. The gist of plaintiff's charge is that Minolta is terminating Interphoto's distributorship agreement in order to preserve and further a combination and conspiracy with other distributors under which Minolta allocated territories and customers and determined and maintained resale prices.

Plaintiff Interphoto, a Delaware corporation, is engaged primarily in the wholesale distribution of photographic equipment throughout the United States.

Defendant Minolta, a New York corporation, distributes and sells, in the United States, photographic equipment made in Japan under the Minolta name. Minolta has distributed and sold Minolta products both through its own sales organization and through independent wholesale distributors and retail dealers.

The complaint charges violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1964). For present purposes, only the alleged violation of § 1 need be considered.[1] The relief demanded in the complaint is that the Court declare that there has been a violation by Minolta of § 1 of the Sherman Act; that Minolta be enjoined from continuing such violation; and that Interphoto receive treble damages for injuries sustained by reason of such violation. Interphoto has demanded a trial by jury.

This opinion contains the findings of fact and conclusions of law which constitute the grounds of the Court's action in granting Interphoto's motion for an interlocutory injunction. Fed.R.Civ.P. 52 (a). The findings of fact are, for the most part, based upon statements in the affidavits and documents submitted by plaintiff and not denied by defendant.

*Statement of Facts*

Except as may be otherwise indicated, the facts stated in this opinion represent facts found by the Court.

Raygram-Hornstein, Inc. (hereinafter "Raygram"), is a division of Interphoto, having been acquired in July, 1967. It is engaged in the wholesale distribution in the United States of Japanese manufactured equipment, including cameras, lenses and related products. From about 1963 until July, 1967, Raygram was defendant Minolta's largest wholesale distributor.

In July, 1967, after Interphoto's acquisition of Raygram, Interphoto entered into a contract with Minolta for the nonexclusive distribution of Minolta products. The agreement had no express termination date; it provided that either company had the right to cancel without cause on thirty days' notice. In a letter accompanying the contract, Mr. Nakamura, Minolta's president, stated that it was his intention to terminate the contract on January 31, 1968.

On December 21, 1967, however, the parties entered into a new agreement which was also terminable by either party without cause on thirty days' notice; but it did have an express termination date of January 31, 1969.

In the sales agreement of December 21, 1967, Minolta enumerated thirteen states in which Interphoto was prohibited from selling Minolta products. This area included states where Minolta acted as its own distributor and sold its products directly to dealers.

Minolta apparently has entered into similar agreements with other distributors, prohibiting them from selling Mi-

1. In addition to charging the existence of a combination and conspiracy in restraint of trade, plaintiff alleges that defendant has unlawfully attempted to monopolize the sale and distribution of defendant's products throughout the United States and that defendant's refusal to continue to deal with plaintiff was in furtherance of that attempt. Such monopolistic behavior, if established, would constitute a violation of Section 2 of the Sherman Act. Because the Court finds that there is clear and convincing proof of the existence of a combination to achieve resale price maintenance and other *per se* illegalities, it is unnecessary to resolve the complex questions presented by the alleged violation of Section 2.

nolta products in certain geographic areas. (Zimet moving Affidavit, Exh. E.)

Minolta has prepared and circulated price lists for Minolta products, suggesting the prices at which its products should be sold by the distributors to the dealers and also at which they should be resold by the dealers. (Nakamura opposing Affidavit, ¶ 3.)

Minolta has, "from time to time, when the orderly marketing of Minolta goods has been seriously threatened, made objection to wholesale distributors and retail dealers who have not honored territorial areas or adhered to suggested prices * * *." (Nakamura Affidavit, ¶ 3.)

On March 19, 1968, Minolta wrote to Mr. Zimet, Raygram's president, complaining of the following:

"During the past few months, your marketing programs have deviated from our present sales agreement and have caused problems in our relationship with the regional distributors. Continuation of this type of marketing can only cause a deterioration in our business relationship, as in essence you have been fluctuating the costs of Minolta merchandise to the photographic dealers.

* * * * * *

Your present marketing programs are indicating to dealers that they can bargain for better prices. This type of merchandising must be stopped as early as possible by all concerned in your company. Otherwise, you will leave me no other alternative but to take such drastic steps that I do not feel are necessary at this moment to end this type of reckless selling methods.

In the future, it is important that my company be consulted at least thirty days prior to any program that you plan to set up that includes Minolta merchandise. Minolta must have the right to approve, or disapprove, any program which reflects a discount other than normally allowed dealers obtaining their Minolta requirements through all our distributors." (Zimet Affidavit, Exh. B.)

On March 27, 1968, Minolta forwarded a confidential bulletin to all distributors designated as "Minolta Dealer Price Schedule".

The substance of the bulletin follows:

"In accordance with our sales agreement, the scheduled dealer prices must be adhered to by your respective companies.

Therefore, so as to prevent any possible deterioration in the established dealer costs on all our products, all proposed programs must be submitted to this office for approval at least thirty days prior to your planned date of announcement. There must not be any program designed that will cause confusion to our dealers in their respective costs for any of our Minolta products." (Zimet Affidavit, Exh. C.)

Interphoto refused to agree to control the prices at which it or its dealers resold Minolta products. It also refused to abide by Minolta's 30-day approval program. (Carney opposing Affidavit, Exh. A). Nevertheless, Minolta continued to police the pricing activities of Interphoto and its dealers, requesting reports from Interphoto when dealers sold or advertised Minolta products at less than Minolta's list prices. (Zimet Affidavit, Exhs. X, Y and Z).

Similarly, Minolta attempted to enforce its territorial prohibitions upon Interphoto, which, if adhered to, would restrain plaintiff from selling Minolta products in the West in competition with Minolta. In fact, Interphoto distributes and sells a wide variety of other brands of photographic equipment in that region.

For example, Minolta received reports from its sales representatives concerning sales by Interphoto in the forbidden areas, and advised Interphoto to terminate such activity. (Zimet Affidavit, Exhs. E and F.)

A customer of Interphoto wrote Minolta concerning its difficulty in not being able to purchase Minolta products from Interphoto within the restricted area, and requested that it be allowed to do so. (Zimet Affidavit, ¶ 13 and Exh. D). In response to this letter, Minolta outlined the territorial restrictions which existed in all the contracts with all its distributors; and, noting its strict adherence to these restrictions, Minolta refused to permit Interphoto to sell Minolta products in that area. (Zimet Affidavit, ¶ 13 and Exh. D).

In addition, Minolta attempted to prohibit its distributors and dealers from competing for sales to United States Military Exchanges. It warned them not to sell to persons who might resell to such agencies. On September 5, 1968, Minolta wrote:

> "Under no circumstances is Raygram-Hornstein to solicit or accept orders from the military or sell to organizations who re-sell to the exchange system.
>
> We specifically wish to alert you about two organizations in the re-sale category:
>
> 1. Jack's Military Sales
> 2. Lester Greenfield Associates
>
> Your cooperation is of utmost importance and any exception to our policy could endanger our national military sales program. We would appreciate your passing the above information to all parties concerned." (Zimet Affidavit, Exh. G).

On December 26, 1968, Minolta notified Interphoto that, effective January 30, 1969, it was cancelling the distributorship contract.

Plaintiff thereupon commenced this lawsuit and moved for a temporary injunction.

*Discussion*

Section 16 of the Clayton Act, 15 U.S.C. § 26 relevantly empowers a private person "to sue for and have injunctive relief * * * against threatened loss or damage by a violation of the antitrust laws * * *." This section also authorizes the issuance of a preliminary injunction. The statute explicitly declares that injunction proceedings are governed by the same principles that are applied in courts of equity.

■■ An application for a preliminary injunction is addressed to the Court's discretion. See, e. g., House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867, 869–870 (2d Cir. 1964); McKesson and Robbins, Inc. v. Charles Pfizer & Co., Inc., 235 F.Supp. 743, 746 (E.D.Pa.1964). If the plaintiff can show: (1) that the conduct to be enjoined is in furtherance of the alleged violations of the Sherman Act; (2) that there is a substantial likelihood that the allegations of the complaint will be sustained at the trial on the merits; and (3) that irreparable and immediate harm to the plaintiff will result if the injunction *pendente lite* is denied, then an injunction should issue. See, e. g., McKesson and Robbins, Inc. v. Charles Pfizer & Co., Inc., supra at 746; Kay Instrument Sales Co., Inc. v. Haldex Aktiebolag, 296 F.Supp. 578 (S.D.N.Y. 1968).

*The Alleged Conspiracies*

Interphoto contends that "defendant's own documents tell a squalid story of conspiratorial price-fixing of the resale prices of its distributors to whom it sells and with whom it competes". Plaintiff's Memorandum in Support of Motion for Preliminary Injunction, at 9. According to Interphoto, the undisputed documentary evidence discloses the unlawful imposition by defendant of territorial restrictions and customer allocations,— all of which constitute *per se* violations of the antitrust laws. Plaintiff urges a finding that Minolta's decision to terminate plaintiff's distributorship contract, because plaintiff continuously refused to acquiesce in these unlawful arrangements, constitutes an illicit refusal to deal in furtherance of an illegal conspiracy.

■ Without inquiry into their purpose or effect, many agreements have

been held to be illegal *per se* under the antitrust laws. See, e. g., United States v. Container Corporation of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (Jan. 14, 1969). Among these *per se* illegal practices are horizontal price-fixing, see, e. g., United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); division of markets, see, e. g., Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); United States v. Arnold, Schwinn & Co., 388 U.S. 365, 379, 87 S. Ct. 1856, 18 L.Ed.2d 1249 (1967); customer allocation, see, e. g., United States v. Arnold, Schwinn & Co., supra at 375–376, 379, 87 S.Ct. 1856, and resale price maintenance, see, e. g., Dr. Miles-Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

■ The presence of a contract, combination or conspiracy is essential to make out these *per se* violations of § 1 of the Sherman Act, and mere unilateral action is insufficient, see, e. g., Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); United States v. Parke, Davis & Co., 362 U.S. 29, 46–47, 80 S.Ct. 503, 4 L. Ed.2d 505 (1960); United States v. McKesson & Robbins, 351 U.S. 305, 76 S. Ct. 937, 100 L.Ed. 1209 (1955); United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

*Price-Fixing* [2]

Minolta has in no way attempted to controvert any of Interphoto's docu-

mentary proof of the existence of unlawful resale price maintenance. Moreover, Minolta admits that it has voiced objections when its dealers or wholesale distributors did not adhere to suggested prices but apparently believes that such objections were innocuous because necessary to preserve the "orderly marketing" of Minolta goods (Nakamura Affidavit, ¶ 3) and to prevent fluctuation in the costs of Minolta merchandise (Zimet Affidavit, Exh. B.)

■ Stabilization of prices has never been a permissible objective under the Sherman Act, and is merely a euphemism for manipulative price-fixing. See, e. g., United States v. Container Corporation of America, supra, 393 U.S. at 333, 89 S.Ct. 510; United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 223, 60 S.Ct. 811.

In United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465 (1919), the Supreme Court laid down a rule which recognized the general right of a businessman to select his customers and refuse to deal. However, in successive decisions, the Court has considerably narrowed the right of a manufacturer to maintain resale prices by refusing to deal with price-cutters. The controlling authorities have distinguished between situations, on the one hand, in which the manufacturer simply announced a suggested resale price and refused to sell to distributors and dealers who charged less (this being lawful unilateral action), and, on the other hand, those situations in which the manufacturer took further steps to effectuate compli-

2. Because Minolta competes with many of its distributors in the sale of photographic equipment, plaintiff claims that the conspiracy is not only vertical. See, e. g., United States v. McKesson & Robbins, 351 U.S. 305, 76 S.Ct. 937 (1955). The presence of vertical agreements would not be essential to the establishment of a horizontal combination to fix prices if substantial price uniformity were achieved at the distributor level. See Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). Plaintiff does not, however, stress the horizontal aspects of price-fixing by Mi-

nolta and its co-distributors. The greater part of the record consists of proof of vertical constraint and coercion to achieve resale price maintenance.

The Court notes, however, that proof of the existence of unlawful resale price maintenance, where the manufacturer is also a distributor—as Minolta is—makes the antitrust violation even more pernicious, see, United States v. McKesson & Robbins, supra, for unlawful cartel activity then co-exists with the attempt to vertically control the discretion of the independent businessman.

ance with the suggestion about resale price. See, e. g., Simpson v. Union Oil Co. of California, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); United States v. Parke, Davis & Co., supra; FTC v. Beech-Nut Packing Co., 257 U.S. 441 (1922).

The Supreme Court has clearly manifested an increasing concern for the preservation of the unfettered discretion of the independent distributor. In determining whether a given scheme falls within the proscription of resale price maintenance under § 1 of the Sherman Act, the Court has placed considerable weight on the extent to which a manufacturer's practices operate coercively on distributors who refuse to cooperate. See generally, The Goals of Antitrust: A Dialogue on Policy; Toward a Three-Dimensional Antitrust Policy, H. M. Blake and W. K. Jones, 65 Colum.L.Rev. 422, 432–434 (1965).

 Today, a manufacturer can avail himself of the *Colgate* doctrine only where he suggests a resale price and does not make any attempts to enforce his suggestion, and he then refuses to sell to dissident distributors. Anything beyond this act of "Doric simplicity" is more than a unilateral refusal to deal and constitutes a *per se* violation of the antitrust laws. George W. Warner & Co. v. Black & Decker etc., 277 F. 2d 787 (2 Cir. 1960). As the court in United States v. Parke, Davis & Co., supra 362 U.S. at 46–47, 80 S.Ct. at 513, said:

"If a manufacturer is unwilling to rely on individual self-interest to bring about general voluntary acquiescence * * * and takes affirmative action to achieve uniform adherence by inducing each customer to adhere to

avoid such price competition, the customers' acquiescence is not then a matter of individual free choice prompted alone by the desirability of the product. * * * The manufacturer is thus the organizer of a price-maintenance combination or conspiracy in violation of the Sherman Act."

Accord Albrecht v. Herald Co., supra; United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966).

 The facts of record before this Court—disclosed by Minolta's own communications and in no way denied—persuasively establish the existence of unlawful resale price maintenance. The blatant and crude techniques utilized by Minolta in its attempt to coerce Interphoto into adherence to the suggested price list do not bear reiteration; they are detailed above in the Court's statement of the facts.

 The great weight of the credible evidence demonstrates the existence of an elaborate policing system whereby Minolta apparently was continuously apprised by its own sales representatives[3] of Interphoto's deviations from Minolta's policies and directives. In an effort to keep Interphoto in line, Minolta threatened Interphoto that its failure to cooperate in the future might call for drastic action.

*Territorial Restrictions*

 In addition to the price-fixing conspiracy, Minolta has combined and conspired to divide and allocate geographic markets. This appears on the face of the sales agreement with Interphoto (Zimet Affidavit, Exh. A). Similar restrictions apparently exist between Minolta and its other distributors

---

3. Mere complaints by customers of a manufacturer that distributors and dealers engage in price-cutting and selective discounting are not enough to imply a combination in violation of § 1, for such complaints arise in the normal course of business. Carbon Steel Products Corp. v. Alan Wood Steel Co., 289 F.Supp. 584 (S.D.N.Y.1968).

Where, however, the manufacturer takes action and relays these complaints to the distributors with accompanying words of "advice", a combination to maintain resale prices can be implied. Minolta has gone even further by employing its sales representatives to police the market.

(Zimet Affidavit, Exh. E). The effect of such contracts is to eliminate competition among the distributors and with Minolta. See, e. g., Addyston Pipe & Steel Co. v. United States, supra; United States v. Arnold, Schwinn & Co., supra, 388 U.S. at 379, 87 S.Ct. 1856 (holding that such action constitutes a *per se* violation of the Sherman Act).[4] As pointed out in the Court's statement of facts, Minolta policed the market allocations and persistently advised Interphoto against unwanted incursions into restricted areas.

Again, Minolta does not deny any of these facts. It simply asserts that objection to the dishonoring of territorial areas was necessary for the orderly marketing of Minolta goods (Nakamura Affidavit, ¶ 3).

*Customer Restrictions*

■ An agreement to allocate customers among competitors is a *per se* violation of the Sherman Act. See, e. g., United States v. Arnold, Schwinn & Co., supra, 388 U.S. at 379, 87 S.Ct. 1856; United States v. Consolidated Laundries Corp., 291 F.2d 563, 574–575 (2d Cir. 1961). Minolta's letter of September 5, 1968 prohibited Interphoto from soliciting or accepting orders for United States Military Exchanges and discloses the existence of an understanding that Minolta alone was to have the right to sell to the exchange systems. (Zimet Affidavit, Exh. G). Minolta offers the following explanation:

"Mr. Zimet's objections to Minolta's policy of selling Minolta products to the United States military exchange systems, shows a complete lack of awareness and understanding on Mr. Zimet's part as to what is required in that particular sphere of distribution. Suffice it to say that the sale of Minolta products to United States military exchange systems is

---

4. The territorial restrictions can be viewed in several ways but the Court finds them unlawful under all applicable theories.

Horizontal arrangements among competitors to divide territories are unlawful *per se*. See, e. g., Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); Addyston Pipe & Steel Co. v. United States, supra. Since Minolta is not only a manufacturer but also a distributor of its own goods, its several contracts with co-distributors which restrict the area of distribution amount to a horizontal combination in restraint of trade.

In White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), the Supreme Court refused to apply the *per se* standard, on the record before it, to vertically imposed territorial limitations where they were not an integral part of a price-fixing scheme; and the Court proposed a rule of reason inquiry. The rationale is apparently that, where a manufacturer restricts the territory of his distributors, there may be some justifiable purpose other than that of stifling competition, and therefore a *per se* rule would be inappropriate. Accord, Sandura Co. v. FTC, 339 F.2d 847 (6th Cir. 1964) (applying the rule of reason to uphold a scheme of exclusive territories where the manufacturer was a failing company utilizing the scheme to insure its survival).

In United States v. Arnold, Schwinn & Co., supra, 388 U.S. at 374, 87 S.Ct. 1856, the court indicates, without elaboration, that *White Motor* survives and, therefore, some vertical territorial restraints may be "sheltered" by the rule of reason because they are not anticompetitive.

The Court, however, restates the established rule that, where vertical territorial restraints are ancillary to price-fixing, or where the price-fixing is an integral part of the distribution system, the price-fixing "infects" the distribution restrictions, and renders them *per se* unlawful. 388 U.S. at 375–376, 87 S.Ct. 1856. Minolta's activities fall within this established rule and are, therefore, *per se* unlawful even if the combination to divide territories is not viewed as being horizontal in nature.

Moreover, *Schwinn* ultimately holds, that even absent any price-fixing scheme, "where a manufacturer sells products to his distributor subject to territorial restrictions upon resale, a *per se* violation of the Sherman Act results", 388 U.S. at 379, 87 S.Ct. at 1865. Whether *White Motor* retains any vitality after this holding, despite the majority's insistence that it does, remains to be seen (see opinion of Stewart, J., concurring in part and dissenting in part, 388 U.S. at 388–389, 87 S.Ct. 1856). In any event, Minolta's distribution agreement falls squarely within the proscription of *Schwinn*.

a specialty and necessarily requires special handling arrangements by the manufacturer." (Nakamura Affidavit, ¶ 7).

■ This precise type of customer exclusion has been held unlawful, see, e. g., United States v. Klearflax Linen Looms, 63 F.Supp. 32 (D.Minn.1945). Minolta's explanation that it has expertise in this area (Carney Supplementary Affidavit, ¶ 2) does not legitimatize the elimination of competition that flows from the restriction.

■ The Court concludes that Interphoto has established by clear and convincing proof that Minolta illegally conspired and combined to fix resale prices and to allocate markets and customers.

*The Termination*

■ However, in order for Minolta's termination of Interphoto's distributorship to be unlawful there must be some causal connection between the alleged conspiracy and the refusal to deal. See, e. g., McKesson & Robbins, Inc. v. Charles Pfizer & Co., supra, 235 F.Supp. at 749; Deltown Foods, Inc. v. Tropicana Products, Inc., 219 F.Supp. 887 (S.D. N.Y.1963); cf. SCM Corporation v. Radio Corporation of America, 407 F.2d 166 (2d Cir. Jan. 9, 1969).

■ Minolta asserts that its termination of the distributorship is totally unrelated to the alleged antitrust violations and that, therefore, the requisite causation is absent. The reason offered for termination is that Minolta has unilaterally decided to effectuate a change in its methods of distributing and selling Minolta products and that it plans to distribute them directly to retail dealers throughout the United States "except

for the Northeastern States and Hawaii", and, "[a]ccordingly, Minolta is terminating its wholesale distribution arrangements with its Mountain States and Southwest wholesale distributors and its Southeast wholesale distributors, as well as its wholesale distribution agreement with the plaintiff". (Nakamura Affidavit, ¶ 4).

Minolta avers that it has been contemplating the elimination of distributors for some time and that its final decision to change its methods was "dictated entirely by business considerations" (Nakamura Supplementary Affidavit, ¶ 3) namely, the success of its West Coast distribution, and the confidence that it could do the job well.

Upon an analysis of the record, the Court rejects Minolta's claim that the decision to terminate the distribution agreement was the result of such a business policy.

Minolta has submitted no affidavits indicating that it has notified other distributors of impending cancellations. No affidavits were procured from any distributors evidencing their awareness of Minolta's plans—which defendant claims were well-known. Minolta offers the naked assertion of the existence of a plan. It fails to submit an iota of evidence of its existence or execution.[5]

Furthermore, Minolta specifically states that it does not plan to take over distribution in the Northeastern region. The only two distributors who operate in this area are plaintiff and Ace Photo Supply Corporation, located in Boston. (Zimet Affidavit, Exh. E). Minolta offers no explanation as to why, if the Northeastern region does not fall within its plans, it is terminating its contract with Interphoto.[6]

5. Minolta claims that, in furtherance of the asserted plan, several officers of Minolta made contact with its New York bank regarding the possibility of acquiring a substantial line of credit. (Nakamura Affidavit ¶ 3). No affidavits are submitted from any of the named bank officials with whom the plans were allegedly discussed.

Defendant does annex four exhibits purporting to represent Minolta's plans which were reviewed by the bank. (Nakamura Affidavit, Exhs. E, F, G and H). The exhibits are unaccompanied by any explanation of their content, the significance of which eludes the Court.

6. Minolta claims that it has distrusted Interphoto since 1967, when apparently

■ There is always the possibility that, at the trial on the merits, Minolta will be able to prove that its refusal to deal with Interphoto was the result of lawful business reasons and not an unlawful act in furtherance of the alleged conspiracy.[7]

■ However, where interlocutory relief is sought, all that plaintiff must prove is that there is a reasonable probability that it will prevail on the merits and that the danger of irreparable damage is immediate. Plaintiff need not show to a certainty that it will prevail. See, e. g., Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725 (3 Cir. 1962); Kay Instrument Sales Co., Inc. v. Haldex Aktiebolag, 5 Trade Reg. Rep. (1968 Trade Cas.) ¶ 72,488 (S.D. N.Y. June 11, 1968); McKesson and Robbins, Inc. v. Charles Pfizer & Co., Inc., supra, 235 F.Supp. at 747. Interphoto has demonstrated that there is such a probability of success on the merits.

■ It has been frequently repeated in this Circuit that a preliminary injunction should issue in an antitrust action, where plaintiff sustains the burden of showing that "the balance of hardships tips decidedly toward plaintiff", and has "raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation". Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953). Accord McKesson and Robbins, Inc. v. Charles Pfizer & Co., Inc., supra, 235 F.Supp. at 747; Kay Instrument Sales Co., Inc. v. Haldex Aktiebolag, supra; Bergen Drug Co. v. Parke, Davis & Co., supra. Interphoto has raised such "serious" questions; and the balance of hardship does "tip decidedly toward plaintiff".

In face of the evidence offered by Interphoto, Minolta's assertion that there is no nexus between its refusal to deal and the alleged conspiracy is regarded by the Court as incredible.

■■ The fact that Minolta's refusal to deal may indeed have been made unilaterally is, at this point, immaterial because " * * * unilateral action, which in the absence of the alleged conspiracy would be lawful, is nonetheless regarded as transgressing the antitrust laws where it is the result of a conspiracy in restraint of trade and undertaken pursuant to conspiratorial aims". McKesson and Robbins, Inc. v. Charles Pfizer & Co., Inc., supra, 235 F.Supp. at 749. The test is whether the refusal to deal "does further" the conspiracy to maintain prices, allocate markets and divide customers, and in the application of the test, "[a] party is held to have intended a natural consequence of its actions". Id. at 749.

Interphoto sold a large block of Minolta products on the West Coast at a discount. Minolta urges that it should not be forced to deal with a distributor in whom it lacks confidence (Nakamura Affidavit, ¶ 5), and points to this distrust as a factor entering into its decision to terminate the distributorship.

The Court rejects this argument. The distrust is, in reality, nothing but the fear that Interphoto will not adhere to suggested resale prices. This is precisely the violation of the antitrust laws which Interphoto has established. Minolta cannot be heard to say that it distrusts Interphoto on this account. Moreover, Minolta cannot with good conscience claim a lack of confidence in Interphoto, which, by Minolta's own admission, has been a highly successful distributor. (Zimet Affidavit, Exh. N).

7. The Court recognizes that a manufacturer may exploit his monopoly by selling his product directly to the ultimate consumer if he chooses. Similarly, he may eliminate existing distributors, establish new ones, or vary his distribution program without violating the antitrust laws but only "so long as such power is not being exercised as part of or in aid of something else which is prohibited by the antitrust laws". Industrial Building Materials, Inc. v. Interchemical Corp., 278 F.Supp. 938, 958–959, 964 (D.C.Cal. 1967). On the record before the Court, Minolta has not shown that its conduct falls within the permissible, lawful channels.

The termination of a relationship with a distributor or dealer who refuses to adhere to prices in the face of the manufacturer's affirmative efforts to secure compliance, is a traditional method of furthering a conspiracy. See, e. g., United States v. Parke, Davis & Co., supra. Cancellation of Interphoto's distributorship will manifestly advance Minolta's resale price maintenance scheme and fortify the territorial restrictions.

In addition to relying on the asserted absence of any nexus between the refusal to deal and the alleged conspiracies, Minolta claims its contractual right to terminate as a basis and justification for denying injunctive relief. This reliance on contract is misplaced. It is not open to doubt that, where a refusal to deal is in furtherance of an illegal conspiracy, the circumstance that the manufacturer or supplier has a contractual right to terminate the agreement is irrelevant. See, e. g., Osborn v. Sinclair Refining Company, 324 F.2d 566, 575 n. 17 (4 Cir. 1963); Albrecht v. Herald Co., supra; United States v. Arnold, Schwinn & Co., supra. This rule applies to defendants who have a right to cancel under a contract, see, e. g., Osborn v. Sinclair Refining Company, supra; McKesson and Robbins v. Charles Pfizer & Co., Inc., supra; to defendants who are simply choosing not to renew contracts, see, e. g., Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051 (1964); and even where there is in fact no contract but merely a history of dealing, see, e. g., Beverage Distributors, Inc. v. Olympia Brewing Co., 5 Trade Reg.Rep. (1968 Trade Cas.) ¶ 72,530 (N.D.Cal. Sept. 19, 1967), modified on other grounds, 395 F.2d 850 (9 Cir. May 17, 1968); Kay Instrument Sales Co., Inc. v. Haldex Aktiebolag, supra; Osborn v. Sinclair Refining Company, supra at fn. 17. The Court may appropriately require that the defendant maintain plaintiff as a distributor pending the determination of a trial on the merits.

Defendant Minolta cites cases which it claims support the rule that a court will not use a preliminary injunction to create a new contract between the parties but only to preserve the status quo. This is true as a general proposition. But where, as here, the court is satisfied that an illegal conspiracy exists and that the refusal to deal is in furtherance of this conspiracy, it will issue an injunction to preserve the relationship, i. e., the status quo. In the cases relied upon by defendant, the Court either was not satisfied that the alleged conspiracy existed, e. g., Carbon Steel Products Corp. v. Alan Wood Steel Co., 289 F.Supp. 584 (S.D.N.Y.1968); Deltown Foods, Inc. v. Tropicana Products Inc., supra, 219 F.Supp. at 891–892; Franklin Sewing Machine Co., Inc. v. Necchi Sewing Machine Sales Corp., 1960 Trade Cas. ¶ 69,768 (S.D.N.Y.1960); Liberty Broadcasting System v. Nat'l League Baseball Club of Boston, 52 Trade Cas. ¶ 67,278 (N.D.Ill.1952), or was not convinced that irreparable and immediate injury would result from denial of the injunction, see, e. g., id. Instant Delivery Corp. v. City Stores Co., 284 F.Supp. 941 (E.D.Pa.1968).

*Irreparable Injury*

After careful analysis of the entire record considered as a whole, the Court is firmly convinced that Interphoto will suffer irreparable and immediate injury if the status quo is not maintained.

In Bergen Drug Co. v. Parke, Davis & Co., supra, and McKesson and Robbins, Inc. v. Charles Pfizer & Co., Inc., supra, the court pointed out that the evidence disclosed that drug retailers prefer to deal with full line, full service wholesalers, and that if a wholesaler is unable to fulfill all of their requirements, they are apt to take their business permanently to a wholesaler who can. Cf. Madsen v. Chrysler Corporation, 261 F.Supp. 488 (N.D.Ill.1967). Interphoto has submitted convincing proof that its customers may take their business elsewhere if

Minolta products are not available.[8] (Zimet Affidavit, Exh. AA; Behrendt Affidavit, Exhs. J and K). In such a situation, it would be impossible to estimate or compute Interphoto's damages for the loss of good will it will suffer as a result of being unable to provide its retail customers with Minolta's products. See, e. g., Bergen Drug Co. v. Parke, Davis & Co., supra; *

\* McKesson and Robbins, Inc. v. Charles Pfizer & Co., Inc. supra;

Beverage Distributors, Inc. v. Olympia Brewing Co., supra. The issuance of a preliminary injunction is, therefore, proper.[9]

Minolta has not shown that it will suffer irreparable injury if an injunction is issued pending a trial on the merits. It simply states that the orderly distribution of Minolta products would come to an end if an injunction were issued. The record does not support such a conclusion, for there is, on the contrary, ample proof that Minolta was extremely satisfied with Interphoto's successful distribution of Minolta's goods. Minolta does not even assert the possibility of financial damage resulting from the grant of an injunction, for it is non-existent.

The Court does not now adjudicate the ultimate questions, which will be decided at a plenary trial. Enough has been shown by Interphoto, however, to establish the probability of its success on the merits and irreparable and immediate injury to Interphoto with no consequent irreparable injury to Minolta if the preliminary injunction is granted, and thus to require the exercise of the Court's discretion to preserve the status quo.

Either party may, if so advised, apply for a preference for trial under Calendar Rule 10(e) of this Court.

It is hereby ordered that, pending final disposition of this action, defendant Minolta Corporation, its agents, servants, employees and those persons in active concert or participation with any of them are restrained and enjoined from refusing to sell to plaintiff as a Minolta distributor, upon customary and nondiscriminatory terms and conditions of sale, and from imposing or attempting to impose any unlawful restraint or requirement upon plaintiff. Plaintiff shall file a bond in the amount of $25,000., upon which filing this order shall become effective.

So ordered.

8. Plaintiff states that Minolta accounts for 40% of plaintiff's sales of Japanese-made cameras and lenses. In addition, 40% of the orders received by plaintiff for such Japanese products apparently specify some Minolta brand product. (Behrendt Affidavit, ¶ 4). Defendant does not refute any of these contentions. If Interphoto cannot furnish Minolta products to its retail customers, immediate loss of customers may follow. Indeed, plaintiff has already received complaints about the possible absence of Minolta goods from its inventory, accompanied by threats to do business elsewhere.

9. Much of Minolta's proof on the question of irreparable harm consists of its insistence that Interphoto knew that Minolta had plans to become its own distributor and was thereby forewarned of the eventual termination of the distributorship. Interphoto denies such knowledge; the affidavits on this particular point are conflicting. However, looking at the documentary proof, the Court finds that the communications from Minolta to Interphoto in no way reveal the existence of a relationship which is about to terminate. Minolta, in fact, admits that it did not make any final plans to terminate until December 1968. In any event, Minolta would not have to show that Interphoto knew of its plans to cancel the distributorship, if the cancellation were lawful and pursuant to the contract, for Interphoto could not then rely on the fact that it assumed the relationship between the parties would continue. But the cancellation by Minolta is not lawful, because it is in furtherance of a conspiracy. Minolta cannot claim that Interphoto has not suffered irreparable harm because the threat of cancellation was known to it.